Charlene R. McINTYRE, Individually and as Administratrix of the Estate of Virgil McIntyre, deceased, Kenneth Shannon McIntyre and Dustin Ragus McIntyre, Appellants,

v.

C. Jack SMITH, M.D., Appellee.

No. 06–99–00133–CV.

Court of Appeals of Texas, Texarkana.

Argued May 16, 2000.

Decided Aug. 1, 2000.

Rehearing Overruled Aug. 1, 2000.

James F. Twombly, The Onstad Law Firm, Austin, for appellant.

Kevin J. Keith, Fowler, Wiles & Keith, LLP, Dallas, for C. Jack Smith.

R. Gary Nutter, Smith, Stroud, McClerkin, Texarkana, for St. Michael Health Center.

Victor Hlavinka, Atchley, Russell, Waldrop, Hlavinka, Texarkana, for R. Schmidt, M.D.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Justice ROSS.

This is an appeal by Charlene R. McIntyre, et al. (McIntyre) of a directed verdict rendered on behalf of C. Jack Smith, M.D., and Collom & Carney Clinic Association (C & C). McIntyre contends that the trial court erred in granting a directed verdict for Smith because there was legally sufficient evidence that Smith was negligent and that his negligence was the proxi-

mate cause of Virgil McIntyre's death. We sustain the sole point of error, and reverse and remand for a new trial on Smith's alleged negligence.

On January 8, 1996, Virgil was hospitalized as a result of severe abdominal pain. Over the next few days, he was treated by a variety of doctors and underwent a series of surgeries, but his condition failed to improve. It was ultimately determined that Virgil would need to undergo kidney dialysis. In preparation for dialysis, on January 19, 1996, Dr. H. Randall Schmidt, a board-certified general surgeon, inserted a central venous Quinton catheter into Virgil's chest. In order to insert the catheter into the chest, Schmidt used a guide wire, commonly called a "J-wire," and a dilator. If this type of catheter is properly placed, the tip of the catheter should be in the superior vena cava, a large vein in the chest. Schmidt confirmed correct placement of this catheter by successfully aspirating blood from the catheter, and by ordering and reviewing a chest x-ray of the catheter placement. Unless Virgil's condition improved, dialysis was to begin the following day, supervised by a nephrologist (a kidney specialist).

The next day, January 20, 1996, Smith was the nephrologist on duty. Smith examined Virgil and ordered dialysis around 1:30 in the afternoon. However, he received a telephone call around 2:30 or 3:00 indicating that the dialysis nurse could not get the catheter to work. Smith ordered a chest x-ray and compared this x-ray to the one that Schmidt had taken the day before. Smith determined that the catheter had not moved, and he then attempted to manipulate the catheter in an effort to aspirate blood. This attempt was unsuccessful, so Smith decided to replace the catheter. After the new catheter was in place, Smith again was unsuccessful in his attempt to aspirate blood, and he ordered a third chest x-ray. From evaluating the new x-ray with the prior two, he deter-

mined that the second catheter was in the same location as the first. Since Smith believed that Virgil needed dialysis, he decided to remove the chest catheter and insert a third catheter in Virgil's leg. This catheter did function properly, and Smith administered Heparin, a blood thinner, and began dialysis. After observing Virgil for three to five minutes, Smith spoke with the family and then left for another hospital to treat another critical patient.

As soon as he reached the second hospital, he testified that he received a call from the dialysis nurse telling him that McIntyre's blood pressure had dropped and that he was experiencing shortness of breath and chest pains. Smith ordered the nurse to administer additional fluids and to do some blood work, rather than take an additional chest x-ray, which the nurse had suggested. When the blood work was available, it showed that Virgil's hematocrit level had decreased, and Smith told the nurse that he would return as soon as possible. However, approximately ten minutes later, before Smith had left the other hospital, he received a third call telling him that Virgil had gone into cardiac arrest.

Emergency surgery was performed on Virgil, and four liters of blood were removed from his chest. The surgeons who performed this procedure found a hole in the innominate vein in the location where the first and second Quinton catheters were placed. They repaired the hole, but due to the massive blood loss, Virgil was declared brain dead. His family chose to remove life support, and Virgil died.

McIntyre brought suit against Schmidt, Donald E. Duncan, M.D.,[1] St. Michael Health Care Center, Southern Clinic, P.A., Smith, and C & C, alleging negligent and grossly negligent medical care of Virgil. The case was tried before a jury, and at the close of both the plaintiffs' and the defendants' cases, Smith and C & C moved

---

1. The physician to whom Virgil was referred by his family physician and who admitted Virgil to the hospital for an emergency appendectomy.

for a directed verdict. Both motions were overruled, and the case was submitted to the jury. The jury deadlocked seven to five on the issue of Schmidt's liability, and since it was unable to reach a verdict, the jury was dismissed. However, before a mistrial was granted, Smith and C & C reasserted their motion for a directed verdict. This motion to reconsider the directed verdict was granted, and a take-nothing judgment was rendered in favor of Smith and C & C. All of the remaining defendants settled their claims with McIntyre, and McIntyre does not challenge the propriety of the directed verdict granted on behalf of C & C; therefore, Smith is the only defendant involved in this appeal.

■ In their sole point of error, McIntyre asserts that the trial court erred in granting a directed verdict for Smith. In reviewing a directed verdict, we examine the evidence in the light most favorable to the party suffering the adverse judgment and disregard all contrary evidence and inferences. *S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex.1996); *Qantel Bus. Sys. v. Custom Controls Co.*, 761 S.W.2d 302, 303–04 (Tex. 1988). If there is any conflicting evidence of probative value which raises a material fact issue, then the judgment must be reversed and the case remanded for the jury's determination of that issue. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994); *Qantel*, 761 S.W.2d at 304. When reasonable minds may differ as to the truth of controlling facts, the issue must go to the jury. *Phippen v. Deere and Co.*, 965 S.W.2d 713, 719 (Tex.App.-Texarkana 1998, no pet.). On the other hand, where no evidence of probative force on an ultimate fact element exists, or where the probative force of slight testimony is so weak that only a mere surmise or suspicion is raised as to the existence of essential facts, the trial court has the duty to instruct the verdict. *Facciolla v. Linbeck Constr. Corp.*, 968 S.W.2d 435, 440 (Tex.App.-Texarkana 1998, no pet.).

■ To prevail in any medical negligence cause of action, the trier of fact must be guided by the opinion testimony of experts. *Hart v. Van Zandt*, 399 S.W.2d 791, 792 (Tex.1965). Through this expert testimony, the plaintiff must prove:

(1) a duty by the physician to act according to a certain standard of care;

(2) a breach of that standard of care;

(3) an injury; and

(4) a causal connection between the breach of care and the injury.

*McCombs v. Children's Med. Ctr. of Dallas*, 1 S.W.3d 256, 259 (Tex.App.-Texarkana 1999, pet. filed). However, not every medical doctor can qualify as an expert in every given case. The offering party must show that his expert has "knowledge, skill, experience, training, or education" regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject. *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996). Generally speaking, in order to qualify, the witness must be a practitioner from the same school of medicine or it must be shown that the issue is common to and equally developed in the witness' field of medical practice. *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779 (1949); *see Porter v. Puryear*, 153 Tex. 82, 262 S.W.2d 933, 936 (1953), *judgment set aside on other grounds*, 153 Tex. 82, 264 S.W.2d 689 (1954).

In this case, Smith moved for a directed verdict on two grounds. First, Smith alleged there was no evidence of the standard of care for a nephrologist, and therefore, there could be no evidence of a breach of that standard. Second, Smith claims that McIntyre failed to present any evidence of proximate cause.

■ It is well established that the threshold question in a medical malpractice case is the standard of care. *Hammonds v. Thomas*, 770 S.W.2d 1, 1 (Tex. App.-Texarkana 1989, no writ). That standard must first be established so that the fact finder can determine if the doctor's conduct deviated from the standard to the degree that it constituted malpractice. *Id.*

at 1–2. It is not sufficient for a medical expert to simply state that he knows the standard of care and to then draw a conclusion as to whether that standard was met. Rather, the expert must explicitly state the standard of care and explain how the defendant's acts met or failed to meet that standard. *Whittley v. Heston,* 954 S.W.2d 119, 122 (Tex.App.-San Antonio 1997, no writ); *Chopra v. Hawryluk,* 892 S.W.2d 229, 233 (Tex.App.-El Paso 1995, writ denied).

 Smith claims that McIntyre failed to establish the applicable standard of care because they failed to elicit this standard from a doctor in the same school of practice, and they failed to show that the practice in question was equally developed in both the field of nephrology and the respective fields of medicine of the other expert witnesses. It is true that none of the expert witnesses were specifically asked if the treatment of this particular patient involved a subject of inquiry common to and equally developed in their respective fields of medical practice and the field of nephrology. However, we do not feel that this question must be explicitly asked and answered in order for an expert in one medical field to be qualified to testify against a practitioner with a different specialization. *See Marling v. Maillard,* 826 S.W.2d 735, 740 (Tex.App.-Houston [14th Dist.] 1992, no writ); *Bilderback v. Priestley,* 709 S.W.2d 736, 740–41 (Tex.App.-San Antonio 1986, writ ref'd n.r.e.).

Through the expert testimony, it is clear that the placement of central venous catheters, which includes the viewing and interpretation of x-rays, are common to and equally developed in many fields of medicine.[2] Many surgeons and radiologists testified, without objection, that they were familiar with the proper way to place a central venous catheter and that this process involved being able to properly interpret an x-ray. Larry Peebles, M.D., specifically stated, without objection, that many different specialists are routinely involved in the placement of catheters, and among those were general surgeons, those who specialize in internal medicine, nephrologists, cardiovascular surgeons, cardiac surgeons, and cardiologists. Roger Youman, Jr., M.D., testified that he has taught many doctors how to properly place a central venous catheter and that part of the catheter placement process includes checking the placement with an x-ray. Schmidt testified that a nephrologist who had been practicing for several years would have placed several Quinton catheters and would know how to use a guide wire in the placement of a catheter. Finally, Smith himself testified that he was trained in how to place catheters, and that he ordered and looked at the chest x-rays in order to determine if the catheter was in the appropriate place. It is clear from the record that the subject at issue is equally developed in many fields of medicine, and thus, those practitioners who perform these medical techniques are qualified to give the standard of care that would apply to Smith's actions in this case. *See Blan v. Ali,* 7 S.W.3d 741, 745–47 (Tex.App.-Houston [14th Dist.] 1999, no pet.).

██ Since the appropriate standard of care was given, we next must determine if there was adequate evidence of Smith's negligence, or in other words, whether Smith deviated from this established standard of care. Schmidt testified that pushing a catheter or a dilator in too far or too aggressively would be negligent. Schmidt also testified that if a physician was aware or suspicious of the fact that a patient had

---

**2.** In Smith's motion for rehearing, he contends that no standard of care was given which governs his conduct because he *adjusted and removed* McIntyre's Quinton catheter, which is a different procedure from *placing* a Quinton catheter. We believe the testimony given regarding the standard of care for placing a catheter obviously includes the actions that Smith took when he adjusted, removed, and placed another catheter in McIntyre's chest.

a hole in a major vein, he should closely monitor the patient and should not administer a blood thinner such as Heparin. Finally, Schmidt testified that he agreed with another doctor's deposition testimony that on January 20, 1996, Smith had enough information in front of him to conclude that the catheter was outside the vein. Next, Youman testified that the Quinton catheters inserted by both Schmidt and Smith were not in the proper position, as was evident by all of the x-rays taken. He also testified that since both Schmidt and Smith should have known that the catheters had exited the vein, the patient should not have been put through dialysis or given Heparin until there had been a proper period of stabilization. Then, Dr. Karl Tomm testified that all of the x-rays showed that the catheters had exited the venous system and that an ordinarily prudent physician would not have initiated dialysis or given Heparin until an adequate period of time had passed in order to make sure that the patient was not going to hemorrhage. Next, Dr. Neill Longley testified that by looking at the x-rays a physician could determine that the catheters had exited the venous system.

Finally, Smith himself was called to testify. He stated that he viewed x-rays eight and nine, and that he manipulated and ultimately removed the nonfunctional catheter that was inserted by Schmidt. He also stated that he inserted a second catheter in the same location, and then after being again unable to aspirate blood from this catheter, he ordered another chest x-ray, which he viewed. He stated that since he could not affirmatively determine what was wrong with the catheter, he decided to remove it and insert a third catheter in the patient's leg. This catheter did work properly, and so Smith then initiated dialysis, waited three to five minutes, spoke with the family, and then left to tend to other patients at a different hospital. He testified that just as he reached the second hospital, he received a call from the dialysis nurse telling him that Virgil's blood pressure had dropped, and that he was experiencing shortness of breath and chest pains. Smith ordered the nurse to administer additional fluids and to do some blood work, rather than take an additional chest x-ray, which the nurse had suggested. Smith received another telephone call from the nurse when the blood work was available, which showed Virgil's hematocrit level had decreased, and Smith told her he would return as soon as possible. However, about ten minutes later, while Smith was still at the other hospital, he received a third call telling him that Virgil had gone into cardiac arrest.

Looking at the testimony in the light most favorable to the party suffering the adverse judgment, we find there was sufficient evidence of probative value to raise a material fact issue as to Smith's deviation from the established standard of care. See S.V., 933 S.W.2d at 8; Qantel, 761 S.W.2d at 303–04.

■ Finally, we must consider whether there was sufficient evidence that Smith's actions were the proximate cause of Virgil's injury. Once again, we will consider the evidence in the light most favorable to McIntyre. See S.V., 933 S.W.2d at 8; Qantel, 761 S.W.2d at 303–04. Schmidt testified that he believes the vein was punctured on January 20, 1996, and that this injury was caused by Smith manipulating or removing the catheter. Schmidt based this opinion on the fact that he had been able to aspirate blood from the catheter that he inserted, there was no indication of any blood in or around the lungs in any of the x-rays, and the patient's blood count remained the same in the twenty-four hours that his catheter was in place. Next, there was testimony from Tomm, which echoed all of Schmidt's reasons as to why the hole could not have been made by Schmidt's catheter placement. Then, there was testimony from Peeples that a catheter could not effectively plug a hole in a vein for a twenty-four-hour period, thereby implicitly stating that Schmidt's catheter placement could not have been

the cause of the hole in the vein. It is undisputed that Virgil's vein had been punctured and that this hole did in fact cause him to hemorrhage and lose his life. It is also undisputed that Heparin was administered by Smith and that this caused Virgil to lose blood more rapidly. According to the evidence presented, and viewing it in the light most favorable to McIntyre, there is sufficient evidence of probative value to raise a fact issue concerning Smith's conduct being the proximate cause of Virgil's death. The point of error is sustained.

The take-nothing judgment is reversed, and the cause is remanded for a new trial.