

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
|---|---|---|
| MARIA G. THOMPSON/ | | |
| LUIS MARIONI, D.C., | § | No. 08-11-00264-CV |
| | | |
| Appellant, | § | Appeal from the |
| | | |
| v. | § | County Court at Law No 5 |
| | | |
| JAIME STOLAR, M.D., | § | of El Paso County, Texas |
| ALIVIO MEDICAL CENTER, | | |
| ALIVIO TREATMENT CENTERS, | § | (TC#2007-4842) |
| P.A. AND LUIS MARIONI, | | |
| D.C./MARIA G. THOMPSON, | § | |
| | | |
| Appellees. | § | |

## **O P I N I O N**

This is a multi-party appeal from a judgment in a medical and chiropractic malpractice case. Maria G. Thompson sued Jaime Stolar, M.D., Luis Marioni, D.C., and Alivio Medical Center and Alivio Treatment Centers, P.A. (collectively referred to as "Alivio") due to knee injuries allegedly caused by treatment she received. For the reasons that follow, we reverse in part and affirm in part.

### FACTUAL SUMMARY

#### THOMPSON'S 1999 ACCIDENT - THE INITIAL KNEE INJURY

On December 10, 1999, Maria G. Thompson was involved in an automobile accident in which she sustained injuries to her right knee and ankle. As a result, she underwent multiple

arthroscopic surgeries on her right knee. The first surgery was performed on February 29, 2000. According to her medical report, Thompson did not feel as though this first surgery helped much. Due to continued pain, Thompson underwent her second surgical procedure on October 10, 2000.

At some point thereafter, Thompson's orthopedic surgeon, Dr. Dickason, released her from his care. Thompson then began receiving chiropractic care from Dr. Crawford, D.C., who treated her with physical therapy and subsequently referred her to Dr. Hernandez, M.D. for an orthopedic evaluation. Thompson complained to Dr. Hernandez of pain in her knee, difficulty bending, kneeling or squatting, some pain with standing and walking, and occasional swelling. After several months, Thompson continued to have severe pain with no improvement and Dr. Hernandez recommended another arthroscopic surgery.

In June 2001, Dr. Hernandez performed a third arthroscopic surgery on Thompson's right knee. Approximately a week after surgery, Dr. Hernandez saw Thompson for a follow-up appointment. While Thompson was doing very well, Dr. Hernandez told her that she was "going to get progressive degenerative changes in her right knee" and that she would eventually need a total knee replacement.[1]

Even after the three surgeries, Thompson continued to experience pain in her knee. At trial, Thompson testified that prior to the 1999 accident she was a runner and loved to dance. However, after the accident and her initial surgeries, she could no longer run and had trouble climbing up and down the stairs. While Thompson admitted that the initial injury limited her abilities, she also testified that from 2000 through 2005 she was able to continue dancing and

---

[1] According to Dr. Hernandez's initial evaluation, after Thompson's second surgery, Dr. Dickason had likewise informed Thompson that she had torn tendons and that eventually she would need a total knee replacement.

exercising. She continued working from 2000 to 2005. In March 2005, Thompson changed doctors and sought chiropractic care from Dr. Luis Marioni, D.C.

### THOMPSON'S INITIAL KNEE INFECTION AND SPONTANEOUS KNEE FUSION

#### *Initial Interactions with Dr. Marioni, Dr. Stolar, and Alivio*

Thompson first visited Dr. Marioni on March 30, 2005, because she wanted to receive physical therapy. Dr. Marioni diagnosed Thompson as suffering from severe osteoarthritis. Because her condition could not be treated or improved with chiropractic care, Dr. Marioni told her that there was nothing he could do. Dr. Marioni then referred Thompson to Dr. Jaime Stolar, M.D. for pain management.[2] Dr. Stolar was a medical doctor who leased office space from Alivio Treatment Centers, P.A., an entity owned by Dr. Maroni. The two men had individual offices in the same building, but shared a receptionist. Both men testified that their practices were independent. There was no employment agreement between Dr. Marioni and/or Alivio and Dr. Stolar. Dr. Marioni admitted that he made several referrals to Dr. Stolar. The patient medical records for Dr. Stolar and Dr. Marioni were also kept together, thereby providing each doctor with the ability to access the other's patient records.

Thompson's first appointment with Dr. Stolar took place on May 11, 2005. According to Dr. Stolar, Thompson explained to him that she did not want to undergo surgery for a knee replacement and instead wanted to receive pain management therapy. Dr. Stolar recommended injecting Thompson's knee with a steroid to relieve the pain. According to Dr. Stolar, he explained to Thompson that while the injections may temporarily relieve her pain, her problem

---

[2] According to Dr. Marioni, he informed Thompson at their initial visit that there was nothing he could do for her as a chiropractor and that he was referring her to Dr. Stolar. Thompson claimed she did not know why she was being referred to Dr. Stolar. She learned of her appointment with Dr. Stolar by receiving an appointment card from the receptionist with his name on it and that the receptionist told her that Dr. Stolar would see her for that particular appointment.

could only be solved by surgery. Initially, Thompson declined to have the injections because she had experienced problems after receiving an earlier injection from Dr. Hernandez. But in August 2005, Thompson returned to Dr. Stolar and at this point, she agreed to try the injection therapy. The injection helped with her pain, but it returned approximately a month later.

On September 30, 2005, Dr. Stolar gave Thompson a second injection. Once again, it temporarily relieved her pain. However, the relief period was shorter than after the initial injection. In November 2005, Thompson returned to Dr. Stolar complaining of increased pain. According to Thompson, her job required that she stand for long periods of time and her whole leg was swollen. Thompson requested another injection, but Dr. Stolar told her that she had to wait until December. On December 19, Thompson returned and received her third and final injection.

On January 16, 2006, Thompson visited Dr. Marioni complaining of severe pain in her knee.[3] Dr. Marioni noted that her knee was warm, sweaty, and swollen and Thompson was complaining of pain which she described as a level of "9" on a scale of "10". At that time, Thompson was unable to work. Thompson claimed Dr. Marioni told her that he thought her knee was infected. In contrast, Dr. Marioni testified that he did not suspect an infection. (RR III 79-80; 118) While he admitted swelling and pain could be signs of infection, the knee was no more swollen than when he had first seen Thompson.[4] At Thompson's request, Dr. Marioni then referred her to Dr. Hernandez. January 16th was the first time Dr. Marioni had seen Thompson since he had referred her to Dr. Stolar for pain management.

---

[3] According to Thompson, she went to see Dr. Marioni to get a referral to another physician.

[4] Dr. Marioni further explained: "[m]y impression was that this chronic condition was going to have flare-ups and, basically, the problem was going to be there as long as she did not have that total knee replacement that was recommended before she came to me."

- 4 -

*Diagnosis of Knee Infection and Subsequent Spontaneous Knee Fusion*

Thompson was originally scheduled for an appointment with Dr. Hernandez on January 26, 2006. Due to severe pain, she called his office on January 23rd to move up the appointment. The following morning Thompson was seen by Dr. Zaltz. Dr. Zaltz withdrew fluid from the knee and diagnosed the infection. That same day, Thompson had incision and drainage procedures performed.

On March 14, 2006 Thompson presented at the emergency room complaining of pain and a swollen knee. She was held overnight for observation and discharged the following day. In March and April 2006, Dr. Hernandez performed additional procedures to drain fluid from the knee. Thompson eventually informed Dr. Hernandez that she would like to undergo total knee replacement surgery. He was reluctant to perform the procedure and referred her to Dr. Richard Westbrook, another orthopedic surgeon. Thompson first saw Dr. Westbrook on April 11, 2007. By this time, she had been free of infection for approximately nine months but her knee had fused. In other words, she effectually had one piece of bone extending from the hip to the ankle. Due to the fusion, the knee replacement surgery would involve "taking down" the knee fusion. Essentially, the procedure involved cutting the fused bones where the knee joint used to be and inserting a totally new knee joint. Dr. Westbrook explained the complications associated with the procedure, including the risk of another knee fusion. Thompson was insistent upon having the surgery, despite the risks, and surgery was performed on August 24, 2007. Thompson had mobility in her leg following the surgery and in fact returned to work in September 2007.

**SUBSEQUENT INJURIOUS FALLS AND**
**SECOND KNEE INFECTION AND SURGICAL KNEE FUSION**

### Two Falls in October 2007

In October 2007, Thompson tripped and fell. Dr. Westbrook saw Thompson following the incident and while she was able to cross her legs, she was unable to extend her knee and straighten out her leg. Dr. Westbrook determined that Thompson sustained a hyperflexion of the knee and suffered a rupture to her patella tendon and a portion of her quadriceps.

Later the same month, Thompson fell a second time while attempting to step out of her daughter's vehicle. She scraped her leg against the asphalt, causing her surgical wound to open. As a result, Thompson went to the hospital and underwent a procedure to wash out the wound.

Dr. Westbrook saw Thompson again on November 6th. She had fluid leaking from an open area on her knee. Dr. Westbrook was concerned that the knee was infected, and he informed Thompson that it may be necessary to remove the knee replacement. Thompson refused to consider removing the knee replacement at that time. Dr. Westbrook attempted to immobilize the knee to allow it time to "settle down" and placed Thompson in a cast.

### Thompson Develops a New Strain of Infection and Surgical Fusion of Thompson's Knee

Thompson later developed an infection as a result of her October fall, this one arising from different bacteria. She received treatment throughout 2008, but in October 2009, Thompson's knee was surgically fused. Dr. Westbrook testified that the surgeries, including the surgical knee fusion that Thompson underwent following her 2007 knee replacement, were all "because of her fall and rupture of the quadriceps mechanism and the subsequent infection that had necessitated...the removal of the prosthesis and the repeat fusion."

### PROCEDURAL BACKGROUND

In October 2007, Thompson filed her original petition against Dr. Stolar, Dr. Maroni and Alivio alleging medical and chiropractic malpractice claims. Specifically, Thompson alleged that in March 2005, she sought treatment at Alivio, a business owned and controlled by Dr. Marioni, for chronic pain in her right knee. According to Thompson, while Dr. Maroni was her treating physician, he negligently referred her to Dr. Stolar for injections to her knee. She alleged that Dr. Stolar was negligent in administering such injections, and that Dr. Stolar and Dr. Marioni were each negligent for failing to diagnose an infection in the knee, which resulted from the negligently administered injections. Thompson also alleged that Dr. Marioni and Alivio were vicariously liable for the negligence of Dr. Stolar based on the theory that Dr. Stolar was Alivio's apparent agent.

As we explain below, Dr. Stolar did not appear at the trial, and the court granted a directed verdict that he was negligent. The trial court also granted a directed verdict as requested by Dr. Marioni and Alivio on Thompson's vicarious liability claims, as well as Thompson's claim that Dr. Marioni was negligent in referring her to Dr. Stolar.

The case was then submitted to the jury. The jury found that Dr. Marioni's negligence proximately caused Thompson's injury[5], and apportioned 80% of the negligence to Dr. Stolar and 20% to Dr. Marioni. The jury awarded Thompson $66,000 in damages for future medical care expenses and $100,000 in damages for loss of earning capacity. It did not award any damages for disfigurement, past medical expenses, physical pain and mental anguish, or physical impairment.

The trial court denied Dr. Marioni and Alivio's motion for judgment notwithstanding the verdict and subsequently award Thompson a judgment against Dr. Stolar in the amount of

---

[5] The jury was instructed to find that Dr. Stolar's negligence proximately caused Thompson's knee injury.

$132,800 and a judgment against Dr. Marioni in the amount of $33,200 together with pre- and post-judgment interest. This appeal follows. We begin our discussion by addressing the issues asserted by Dr. Marioni in his cross-appeal.

## DR. MARIONI'S CROSS APPEAL

Dr. Marioni challenges the legal sufficiency of the evidence to support the jury's finding that he was negligent. In a medical negligence case, the plaintiff must prove: (1) a duty by the physician to act according to a certain standard of care; (2) a breach of that standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury. *Moreno v. M.V.*, 169 S.W.3d 416, 420-21 (Tex.App.--El Paso 2005, no pet.), *citing McIntyre v. Smith,* 24 S.W.3d 911, 914 (Tex.App.--Texarkana 2000, pet. denied) *and McCombs v. Children's Med. Ctr. of Dallas,* 1 S.W.3d 256, 259 (Tex.App.--Texarkana 1999, pet. denied). Dr. Marioni first complains that Thompson failed to produce any evidence of an applicable standard of care or a breach of that standard of care. Alternatively, he argues Thompson presented no evidence that any breach proximately caused further injury to Thompson's knee.

## STANDARD OF REVIEW

A legal sufficiency or "no evidence" challenge will be sustained if the party suffering the adverse decision at trial shows: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Stanley Works v. Wichita Falls Independent School District*, 366 S.W.3d 816, 828 (Tex.App.--El Paso 2012, pet. denied). When conducting a legal sufficiency review, we must view the evidence in the light favorable to the verdict, crediting favorable evidence if a

reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller*, 168 S.W.3d at 830. The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller*, 168 S.W.3d at 827.

## STANDARD OF CARE

The threshold question in a medical malpractice case is the standard of care. *Moreno*, 169 S.W.3d at 421; *McIntyre,* 24 S.W.3d at 914; *Hammonds v. Thomas,* 770 S.W.2d 1, 1 (Tex.App.--Texarkana 1989, no writ). It is important to first establish the standard of care so that the fact finder can determine whether the doctor's conduct deviated from the standard to the degree that it constituted malpractice. *Moreno*, 169 S.W.3d at 421; *McIntyre,* 24 S.W.3d at 914; *Hammonds,* 770 S.W.2d at 1-2. It is not sufficient for a medical expert to simply state that he knows the standard of care and to then draw a conclusion as to whether that standard was met. *Moreno*, 169 S.W.3d at 421. Rather, the expert must explicitly state the standard of care and explain how the defendant's acts met or failed to meet that standard. *Moreno*, 169 S.W.3d at 421; *McIntyre,* 24 S.W.3d at 915; *Whittley v. Heston,* 954 S.W.2d 119, 122 (Tex.App.--San Antonio 1997, no writ); *Chopra v. Hawryluk,* 892 S.W.2d 229, 233 (Tex.App.--El Paso 1995, writ denied).

Dr. Donald Bonney, D.C. served as Thompson's expert witness to establish the proper standard of care and how Dr. Marioni breached that standard. According to Dr. Bonney, Dr. Maroni breached the standard of care in three respects. First, when Dr. Marioni determined Thompson could not benefit from chiropractic care, he should have referred her to an orthopedic surgeon. In other words, Dr. Marioni should not have accepted Thompson's case. Second, Dr. Marioni failed to properly manage Thompson's care from March 30, 2005 until January 16,

- 9 -

2006 because (1) he failed to discuss it with Dr. Stolar and (2) he failed to review Thompson's medical records during that time. Finally, Dr. Marioni breached the standard of care by failing to "perform an emergent referral" on January 16, 2006.

We need only address the third violation. The first is of no import because the trial court granted Dr. Marioni's motion for directed verdict with regard to negligent referral to Dr. Stolar and Thompson has not challenged that ruling. As for Dr. Marioni's failure to monitor Thompson's condition throughout her relationship with Dr. Stolar, the only testimony with respect to causation relates to the lack of a prompt or emergent referral and Thompson's eventual injury, a spontaneous knee fusion. Thus, our analysis will focus on whether Dr. Bonney's testimony sufficiently established that, based on the facts and circumstances, the standard of care required Dr. Marioni to make an emergent referral on January 16, 2006.

Dr. Bonney testified that he reviewed Dr. Marioni's medical reports and in his professional opinion, "[Thompson] was, in fact, showing signs of an infection of the right knee, at least no later than January 16, 2006." Dr. Bonney identified the signs of infection as the knee being warm, sweaty, and swollen or inflamed. He was then asked the significance of the fact that Thompson's pain had increased from a "5" when Dr. Marioni had seen her in March, to a "9" when he saw her the following January, Dr. Bonney testified as follows: It's significant for two reasons. Number one, if my patient's pain levels are going up, I'm not doing the right thing, or I'm missing something and I'm not helping that patient. So, that, of course, is why we practice -- to bring relief.

> And, secondly, it's significant that it could be a symptom of an infection. And that would be clearly a red flag for me when my antennas would be going up.

Finally, after being read the definition of negligence and then asked for his opinion as to whether or not Dr. Marioni was negligent, Dr. Bonney stated: Yes, sir. My professional opinion is that he was, in fact, negligent in his treatment and management of Ms. Thompson.

On appeal, Dr. Maroni contends that Dr. Bonney's testimony is no evidence of either the applicable standard of care or breach thereof. Specifically, he takes issue with the fact that Dr. Bonney did not: (1) testify regarding any specific personal experience he had in treating patients with infections similar to Thompson's, despite testifying it is very rare for knee infections to present in a chiropractic office; and (2) "cite any chiropractic medical literature demonstrating that an emergent (as opposed to some other type of referral) represented the applicable standard of chiropractic care" when an infection is suspected. To the extent Dr. Marioni is attacking Dr. Bonney's credibility as an expert witness, this issue was not raised at the trial level and therefore not properly preserved for appeal. Moreover, this argument ignores Dr. Marioni's own testimony that a chiropractor must provide an immediate referral if an infection is suspected.

Dr. Marioni testified regarding his practices and what he understood as the applicable standard of care. If a chiropractor suspects an infection, the patient needs an immediate referral so the joint can be examined to diagnose the infection. Dr. Marioni admitted that he observed the symptoms and signs which Dr. Bonney believed should cause a reasonable and prudent chiropractor to suspect an infection. And Thompson testified that Dr. Marioni told her on January 16th that her knee was likely infected but he did not express that the situation was an emergency.

As the trier of fact, the jury was free to resolve the conflict in the testimony. In doing so, a reasonable juror could have concluded that Dr. Marioni did in fact suspect an infection on

- 11 -

January 16, and that by his own admission the standard of care required that he provide Thompson an immediate referral to a physician. We conclude the evidence was legally sufficient to support the jury's decision that the applicable standard of care required that Dr. Marioni to make an emergent referral on January 16, 2006 and his failure to do so breached that duty.

CAUSATION

We must now determine whether Thompson presented legally sufficient evidence that Dr. Marioni's failure to provide Thompson with an immediate or emergent referral proximately caused further injury to Thompson's knee.

*Applicable Law*

A plaintiff in medical malpractice case must prove that her injuries were proximately caused by the negligence of the defendant. Proximate cause requires proof of: (1) foreseeability, and (2) cause-in-fact. *Leitch v. Hornsby*, 935 S.W.2d 114, 118-19 (Tex. 1996); *Arlington Mem'l Hosp. Found., Inc. v. Baird*, 991 S.W.2d 918, 922 (Tex.App.--Fort Worth 1999, pet. denied). Foreseeability means that a plaintiff is required to show that the defendants should have anticipated the danger that resulted from their negligence. *McClure v. Allied Stores of Texas, Inc.*, 608 S.W.2d 901, 903 (Tex. 1980). Cause-in-fact, on the other hand, means that a plaintiff must show that the defendants' negligence was "a substantial factor in bringing about the injury and without which no harm would have occurred." *Id*.

The ultimate standard of proof on the causation issue is "whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the [injury] and without which the harm would not have occurred." *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995), *quoting Kramer v. Lewisville Mem'l Hosp.*, 858

- 12 -

S.W.2d 397, 400 (Tex. 1993). The plaintiff must establish a causal connection between the defendant's negligence and the injuries based upon a "reasonable medical probability" and not mere conjecture, speculation, or possibility. *Park Place Hosp.,* 909 S.W.2d at 511; *Kramer*, 858 S.W.2d at 400; *W.C. LaRock, D.C., P.C. v. Smith*, 310 S.W.3d 48, 55 (Tex.App.--El Paso 2010, no pet.). However, a plaintiff, "is not required to establish causation in terms of medical certainty nor is he . . . required to exclude every other reasonable hypothesis." *Bradley v. Rogers,* 879 S.W.2d 947, 953-54 (Tex.App.--Houston [14th Dist.] 1994, writ denied). Whether expert testimony on causal connection rests upon reasonable medical probability must be determined by the substance and context of the testimony rather than semantics or use of a particular term or phrase. *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 500 (Tex.1995); *Baird,* 991 S.W.2d at 922.

### *Expert Testimony*

The relevant expert testimony regarding causation came largely from Dr. Benzel Christopher McMaster. Dr. McMaster is a board certified orthopedic surgeon. He testified that "based on a reasonable medical probability" the infection diagnosed on January 24th was a result of a complication from an injection administered by Dr. Stolar on December 19, 2005. Dr. McMaster explained that signs and symptoms of the infection would have appeared approximately a week later. The type of infection Thompson developed was "highly unusual" indicating that an improper technique was likely used.

When asked to identify the cause of Thompson's spontaneous knee fusion (her first knee fusion), Dr. McMaster testified that, in his opinion, the auto-fusion was caused by, "the infection, and in my opinion, the delay in handling it." It is not clear from this testimony whether the delay referred to a failure by Dr. Stolar or by Dr. Marioni. Following this comment, however,

- 13 -

Dr. McMaster explained his opinion with respect to Dr. Stolar's negligence. First, he criticized Dr. Stolar's technique in giving the injection and noted, "Dr. Stolar failed to recognize an infection that would be ordinarily obvious to a physician of average experience and average education." Dr. McMaster then summarized the three circumstances by which Dr. Stolar breached the standard of care: (1) in giving Thompson injections at all when her medical history did not indicate such injections; (2) in using improper technique and allowing a highly unusual bacteria to be injected into Thompson's knee; and (3) in failing to recognize the signs and symptoms of infection.

Dr. McMaster explained that a knee infection is a medical emergency and should be treated as soon as possible. The only way to properly diagnose the knee infection was by drawing fluid from the knee and testing it, and he acknowledged that Dr. Marioni, as a chiropractor, was not allowed to perform such a procedure and therefore could not have made the diagnosis.

Dr. McMaster did testify that during the eight day period between January 16th -- when Thompson last saw Dr. Marioni -- and January 24th -- the date the infection was diagnosed by a physician, Thompson most likely suffered further deterioration of her knee. But he could not quantify the deterioration and "did not know of even a scale [he] could use." The exchange below followed:

> Q. [BY COUNSEL FOR DR. MARIONI]: That nothing [Dr. Marioni] could have -- even if he had referred her right then and there, she -- the damage would have already been done to her knee?
>
> A. [BY DR. McMASTER]: Certainly to a great degree, yes.
>
> Q. Okay. Would she likely have suffered the same complications in her subsequent knee replacement surgery?

- 14 -

A. It -- the reason I am hesitant is because what actually happened is her knee underwent a spontaneous fusion, which indicates the entire synovium was wiped out. It would be my opinion that it would have been much less likely that that would have occurred had she promptly been referred.

Q. There's just no way to know?

A. There's no way to know.

Nor could Dr. McMaster assign a percentage of "less likely." He "would simply be guessing, which is not appropriate." Finally, he admitted, "[t]here's no way to know."

Dr. R. David Bauer testified as a witness for Dr. Marioni via a videotaped deposition. Dr. Bauer is a board certified orthopedic surgeon specializing in spinal injury and disease.[6] He reviewed Thompson's medical records from her 1999 knee injury "up to and including her knee replacement surgery and subsequent fusion." According to Dr. Bauer, if the infection was present on January 16th, there was nothing Dr. Marioni could have done as a chiropractor to remove it. There was no way to know how much damage occurred as a result of the delay in diagnosis between January 16th and January 24th. When asked if there were "any way to tell whether the knee was, in fact, the same, worse, or better during that eight day delay," and he responded, "[t]here's absolutely no way to know." Both experts agreed that the longer an infection persists, the more likely it is to cause harm and that the resulting harm will be worse.

---

[6] In addition, Dr. Bauer testified that he is not only authorized to see workers' compensation patients, but was appointed by the Texas Department of Insurance to the medical quality review board. As a member of the review board, Dr. Bauer reviews the care that workers' compensation patients receive. This review encompasses care patients receive from both physicians and non-physician practitioners and includes care from chiropractors and physical therapists. Dr. Bauer also testified that he has experience with referring patients to chiropractors and physical therapists, as well as with treating patients referred by chiropractors and physical therapists.

*Analysis*

Dr. Marioni challenges the legal sufficiency of the evidence to establish the causal connection between the breach of the standard of care and the injury or harm suffered by Thompson. At trial, Thompson bore the burden of establishing a causal connection between her injury and the negligence of Dr. Marioni based upon "reasonable medical probability," not mere conjecture, speculation, or possibility. *See, e.g., Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995); *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 500 (Tex. 1995); *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 400 (Tex. 1993); *Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex. 1988). In other words, the ultimate standard of proof on the causation issue is whether, "by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." *Park Place Hosp.*, 909 S.W.2d at 511, *citing Kramer*, 858 S.W.2d at 400. Therefore, as applied to this case, the issue is would there have been a better outcome had the diagnosis of her knee infection been made immediately after seeing Dr. Marioni and if so, would that better outcome have avoided a spontaneous knee auto-fusion?

The implications of an emergent or immediate referral are clear enough -- Thompson would be seen by a physician before January 24th, the date she did in fact see a physician as a result of Dr. Marioni's referral. But the reality of applying this negligent act or omission in the context of a causation problem is much more complex. The evidence establishes that Dr. Marioni did not cause the infection. The infection resulted from an injection administered by Dr. Stolar and had been present in Thompson's knee for approximately three weeks when Dr. Marioni saw her on January 24th. The uncontradicted evidence also shows that a physician inserting a needle into Thompson's knee and drawing out fluid was the only way Thompson's

- 16 -

knee infection could be diagnosed.[7]  Therefore, even assuming that providing an immediate or emergent referral meant literally sending someone immediately, and that Dr. Marioni did in fact send Thompson directly from his office straight over to Dr. Hernandez's office on January 16th, Thompson would still have had an infection and still have had to have a needle inserted into her knee to draw out fluid.[8]

We must determine whether the evidence is sufficient to prove, by a preponderance of the evidence, that had Dr. Marioni made an immediate referral on January 16th, a "reasonable medical probability" existed that Thompson's auto-fusion would not have occurred.  There was no evidence detailing how the infection may have progressed between January 16th and January 24th.  There was no testimony as to the normal progression of that type of bacterial infection nor how it would have been treated had it been caught earlier.  The record may be crystallized to one statement: the auto-fusion would have been "less likely" if Thompson had been seen by an orthopedic surgeon immediately, and even then, there is no way to know how "less likely" it would have been.

We must conclude that Thompson produced legally insufficient evidence that had she been immediately referred to a physician, she would not have suffered the injuries forming the

_____

[7]  As a chiropractor, Dr. Marioni could not diagnose or treat the infection, regardless of whether or not he suspected such infection existed.

[8]  Of note, even if we assume that Thompson saw Dr. Hernandez on January 16th, we must then also assume one of three alternatives:  (1) Dr. Hernandez would have immediately suspected a knee infection if he saw Thompson on January 16th; or (2) that Dr. Marioni did in fact tell Thompson he suspected a knee infection and that Thompson would have relayed that suspicion to Dr. Hernandez; or (3) that Dr. Marioni did in fact suspect a knee infection and would have informed Dr. Hernandez of his suspicion as party of the emergent referral.  However, if one of the three above alternatives occurred, then it is reasonable to assume, based on the facts and what actually happened when Thompson saw a physician on January 24th, that the physician would have drawn fluid from her knee, diagnosed the infection and begun treatment.

basis of her suit. Dr. McMaster's testimony provides mere speculation. We sustain Dr. Marioni's issue on appeal and reverse and render the judgment as to him.

## THOMPSON'S APPEAL

In her appeal, Thompson presents two issues. In Issue One, she challenges the factual sufficiency of the evidence to support the jury's findings on damages. In Issue Two, she complains that the trial court erred in granting a directed verdict in favor of Alivio Treatment Centers, P.A. because the evidence was legally sufficient to prove that Dr. Stolar was the apparent agent of this entity.

### DAMAGES

The jury found that both Dr. Stolar and Dr. Marioni were negligent and that such negligence proximately caused injury to Thompson. As a result, the jury awarded Thompson $66,000 in damages for future medical expenses and $100,000 in damages for loss of earning capacity. However, the jury awarded zero damages for the remaining categories of damages: past and future physical pain and mental anguish; past and future physical impairment; past and future disfigurement; and past medical expenses. The first issue challenges the factual sufficiency of the evidence to support the jury's findings on damages. More specifically, Thompson challenges each of the jury's zero damages findings as against the great weight and preponderance of the evidence because there is uncontroverted evidence of an objective injury. Thompson also challenges the jury's finding of $66,000 for future medical expenses as against the great weight and preponderance of the evidence.

### *Standard of Review*

A challenge to the propriety of a damages award is subject to factual sufficiency review. *See Lofton v. Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex. 1986). When conducting a factual

sufficiency review, we must consider and weigh all of the evidence, both in support of and against the findings, in order to decide whether the verdict should be set aside. *Doctor v. Pardue*, 186 S.W.3d 4, 17 (Tex.App.--Houston [1st Dist.] 2006, pet. denied), *citing Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *see Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Lofton*, 720 S.W.2d at 805. We reverse and remand for a new trial only if the verdict is so against the great weight and preponderance of the evidence that it is manifestly unjust or shocking to the conscience. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Pool*, 715 S.W.2d at 635.

In conducting our review, we must bear in mind that the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Golden Eagle Archery*, 116 S.W.3d at 761; *Jones v. Tarrant Util. Co.*, 638 S.W.2d 862, 866 (Tex. 1982). As this court is not a fact finder, we may not substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Pool*, 715 S.W.2d at 634. Further, as fact finder, the jury is free to believe one witness and disbelieve another. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). The jury also resolves any inconsistencies in any witness's testimony. *McGalliard*, 722 S.W.2d at 697. Where the award is based on non-empirical damages such as mental anguish and pain and suffering, the court will generally leave that determination to the discretion of the jury. *See Dico Tire, Inc. v. Cisneros*, 953 S.W.2d 776, 791-92 (Tex.App.-- Corpus Christi 1997, writ denied).

Where, as here, someone suffers personal injuries, the damages fall within two broad categories: economic and non-economic damages. *Golden Eagle Archery*, 116 S.W.3d at 763. Texas recognizes the following categories of non-economic damages: pain, suffering, mental anguish, disfigurement, and physical impairment. *Id.* at 769. These categories of non-economic

- 19 -

damages may overlap. *Id*. at 770. When the jury's failure to award damages in more than one overlapping category is challenged, we must first determine if the evidence unique to each category is factually sufficient. *Id*. at 775. If it is not, we must then consider all of the overlapping evidence, together with the evidence unique to each category, to determine if the total amount awarded in the overlapping categories is factually sufficient. *Id*. This standard of review gives due regard to a jury's choice of whether to award damages and if so, how to categorize those damages that could reasonably fall into more than one category of damages. *Id*.

Finally, "[b]efore a court can properly conduct a factual sufficiency review, it must first have a clear understanding of the evidence that is pertinent to its inquiry. The starting point generally is the charge and instructions to the jury." *Golden Eagle Archery*, 116 S.W.3d at 762. In the instant case, the relevant jury question asked the jury to fill in nine blanks: (1) past physical pain and mental anguish; (2) future physical pain and mental anguish; (3) past physical impairment; (4) future physical impairment; (5) past disfigurement; (6) future disfigurement; (7) past medical expenses; (8) future medical expenses; and (9) loss of earning capacity. The only definition relevant to the various categories of damages contained in the charge was the definition of mental anguish. Specifically, the jury was instructed as follows:

> 'Mental Anguish,' means a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment, or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair, and/or public humiliation.

The jury was also instructed to award only those damages which would fairly and reasonably compensate Thompson for any injury she may have suffered as a result of *the occurrence in question*. [Emphasis added]. Further, by a separate paragraph, the jury was specifically instructed as follows:

Do not include any amount for any condition not resulting from the occurrence in question.

Likewise, the jury was instructed not to include any amount for any condition: (1) relating to Thompson's failure to act as "a person of ordinary prudence would have done under the same or similar circumstances in caring for and treating her injuries, if any, that resulted from the occurrence in question," and (2) existing prior to the occurrence in question, "except to the extent, if any, that such other condition was aggravated by any injuries that resulted from the occurrence in question." Finally, the charge instructed the jury to consider each element separately and to exclude damages for one element in any other element. Unless the record demonstrates otherwise, we must presume the jury followed the instructions given. *Golden Eagle Archery*, 116 S.W.3d at 771.

### *Zero Damages Despite Evidence of an Objective Injury*

The presence or absence of pain is an inherently subjective question for which the plaintiff bears the burden of production and persuasion. *Enright v. Goodman Distribution, Inc.*, 330 S.W.3d 392, 398 (Tex.App.--Houston [14th Dist.] 2010, no pet.), *citing Dollison v. Hayes*, 79 S.W.3d 246, 249-51 (Tex.App.--Texarkana 2002, no pet.); s*ee Waltrip v. Bilbon Corp.*, 38 S.W.3d 873, 881 (Tex.App.--Beaumont 2001, pet. denied). However, when uncontroverted evidence of an objective injury exists, a jury finding that the plaintiff suffered no past pain and suffering is against the great weight and preponderance of the evidence. *Hammett v. Zimmerman*, 804 S.W.2d 663, 665 (Tex.App.--Fort Worth 1991, no writ); s*ee Lopez v. Salazar*, 878 S.W.2d 662, 662-63 (Tex.App.-Corpus Christi 1994, no writ); *see also Lowery v. Berry*, 269 S.W.2d 795, 796-97 (Tex. 1954)(holding that where a party establishes damages as matter of law, a jury is not at liberty to award zero damages). Alternatively, if the plaintiff's complaints

are subjective in nature and, therefore, incapable of direct proof, the jury may award zero damages. *See Hyler v. Boytor*, 823 S.W.2d 425, 427-28, *citing Blizzard v. Nationwide Mut. Fire Ins. Co.*, 756 S.W.2d 801, 805 (Tex.App.--Dallas 1988, no writ); *see also Sanchez v. King*, 932 S.W.2d 177, 182 (Tex.App.--El Paso 1996, no writ)(finding that where evidence of plaintiff's injury is purely subjective, as in soft tissue cases, a jury may deny an award of damages).

*Analysis*

The record contains uncontroverted evidence that Thompson suffered from several physical problems. At the time of trial, Thompson's knee was permanently fused, causing her knee to remain straight and fully extended at all times. Her knee also bears a large scar and pictures taken one week prior to trial and depicting the scar on Thompson's knee were admitted into evidence.

However, there was also evidence of several different events, all of which the jury could have believed played a role in Thompson's injuries. First, there was testimony regarding Thompson's 1999 car accident, the injury to her knee and ankle, and the multiple surgeries that followed, all of which occurred before Thompson even met the Appellees. This evidence included medical records from Dr. Hernandez detailing Thompson's injuries and explaining that she would eventually have to undergo a total knee replacement. Dr. Hernandez's notes repeatedly described Thompson's pain as severe, and in a note from February 2004 he describes Thompson as "severely debilitated." There were also notes from Dr. Hernandez's medical report that, more than a year before Thompson ever saw Dr. Marioni or Dr. Stolar, she was taking narcotic pain medication to control her pain and "get through the day." There was also testimony that the second, post-knee replacement infection which eventually required doctors to surgically and permanently fuse her knee, was caused by a fall Thompson had after her knee

- 22 -

replacement surgery. The jury was instructed not to "include any amount for any condition not resulting from the occurrence in question." Here, the jury could have reasonably believed that the knee replacement surgery was inevitable and the subsequent falls which led to infection and eventually to a surgical fusion of Thompson's knee were unrelated to Dr. Stolar's negligence. For these same reasons, the jury's award of $66,000 for future medical expenses is not against the great weight and preponderance of the evidence.

Finally, we address Thompson's contention that the evidence is factually insufficient to support an award of no damages for past medical expenses. With respect to past medical expenses, the jury heard evidence that all of Thompson's past medical expenses had been paid by worker's compensation. There was no limiting instruction given with this information. Therefore, the jury could have decided that based on the amounts paid by worker's compensation benefits, Thompson was fairly compensated for past medical expenses. Accordingly, the evidence is sufficient to sustain a zero damages award for past medical expenses.

As stated above, the fact finder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. As fact finder the jury was also free to believe one witness and disbelieve another, and resolve inconsistencies in testimony. Keeping this in mind, we find the evidence is factually sufficient to sustain the jury's findings of zero damages for pain and suffering and mental anguish, physical impairment and disfigurement as well as the $66,000 award for future medical expenses. We overrule Thompson's first issue.

### DIRECTED VERDICT

In Thompson's second issue, she challenges the trial court's decision to direct a verdict in favor of Alivio Treatment Centers because the evidence was legally insufficient to prove Alivio held Dr. Stolar out as its employee or agent.

- 23 -

### Standard of Review

A directed verdict is proper only under limited circumstances: (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent; or (2) when the evidence is insufficient to raise a material fact issue. *See Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 919-20 (Tex.App.--Fort Worth 2009, pet. denied), *citing Prudential Ins. Co. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) and *Hogue v. Propath Lab., Inc.*, 192 S.W.3d 641, 646 (Tex.App.--Fort Worth 2006, pet. denied). In reviewing a directed verdict, we must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Farlow*, 284 S.W.3d at 919-20, *citing City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

When the question to be decided is whether the party opposing the directed verdict raised a material fact issue, we consider all the evidence in a light most favorable to the party against whom the verdict was instructed. *Farlow*, 284 S.W.3d at 920. In doing so, we disregard all contrary evidence and inferences, and we give the opposing party the benefit of any reasonable inferences created by the evidence. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 234 (Tex. 2004). If we determine that any conflicting evidence of probative value raises a material fact issue on any theory of recovery, then the directed verdict is improper because such an issue is for the jury to resolve. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994).

### Ostensible Agency

"Ostensible agency," also known as agency by estoppel or apparent agency, does not depend upon an express appointment or actual authority but instead arises from the words, attitude, conduct, and knowledge of the principal, not the agent. *Valdez v. Pasadena Healthcare*

*Mgmt., Inc.*, 975 S.W.2d 43, 49 (Tex.App.--Houston [14th Dist.] 1998, pet. denied). In fact, an ostensible or apparent agent is not really an agent at all. *Id.* Rather, ostensible agency in Texas is based on the notion of estoppel, that is, some representation by the principal causes justifiable reliance and results in harm. *Baptist Memorial Hospital Sys. v. Sampson,* 969 S.W.2d 945, 948 (Tex. 1998); *Ames v. Great Southern Bank,* 672 S.W.2d 447, 450 (Tex. 1984). The elements of ostensible agency are that: (1) the principal (Alivio), by some holding out or act; (2) caused the third party (Thompson) to reasonably believe in the agent's (Dr. Stolar's) authority; and (3) the third party (Thompson) justifiably relied on the representation of authority. *Baptist Memorial Hospital Sys.*, 969 S.W.2d at 948.

On appeal, Thompson complains that the evidence raised fact issues with respect to each of the three elements of ostensible agency. Specifically, Thompson contends that there are genuine issues of material fact as to whether Dr. Stolar was Alivio's ostensible agent based on the following evidence: (1) Dr. Marioni and Dr. Stolar both leased office space from Alivio; (2) the office building bore the sign "Alivio Treatment Centers" and there was no signage posted inside the offices stating that Dr. Marioni and Dr. Stolar had separate practices; (3) the two doctors shared a waiting area and a receptionist; (4) the receptionist made appointments for both doctors; and (5) Dr. Marioni referred patients to Dr. Stolar for medical services which he could not provide.

Thompson relies on evidence of Alivio's failures to sufficiently distinguish itself and Dr. Marioni's practice from Dr. Stolar's practice. However, a finding of ostensible agency requires an affirmative act on the part of the principal (Alivio). Absent any evidence of such an affirmative act which Thompson relied upon, and absent any evidence that such reliance caused her harm, a directed verdict is proper. Issue Two is overruled.

- 25 -

## DR. STOLAR'S APPEAL

Dr. Stolar, appearing *pro se*, brings several issues challenging the sufficiency and validity of the evidence to support the verdict against him. The initial paragraph in his summary of the argument reflects his position:

> Even though evidence was presented, which included expert testimony[,] all the evidence, accusations, allegations and related comments were based on opinions only. As stated in the Affidavit and the Second Motion for New Trial . . . Dr. Stolar's contention is that the entire case against him was built on a false premise: Ms. Maria G. Thompson's knee infection was caused by Dr. Stolar's injections."

With regard to the appropriate standard of review for legal sufficiency, he questions, "How can courts assume that jurors credited testimony favorable to the verdict and disbelieved evidence contrary to it, when in fact jurors were not even exposed to contrary evidence?" He further posits that if the jury is expected to resolve conflicts in the evidence, it is indispensable that the jury be presented with contrary evidence:

> It follows that in the absence of contrary evidence there cannot even be the possibility of conflict. . . . The absence of contrary evidence would in fact disable reasonable and fair minded people not only from differing in their conclusions but even from reaching valid conclusions as to the culpability or innocence of Dr. Stolar. As far as the evidence falling within the zone of reasonable disagreement, there can be no disagreement when there is only one-sided evidence, as was the case in the trial against Dr. Stolar.

We do not disagree with his statement of the standard of review. But as a defendant, it was indeed Dr. Stolar's obligation to present contrary evidence. He did not do so, although portions of his deposition were read to the jury in which he testified concerning his treatment of Thompson. We overrule Issue One.

In Part A of his second issue, Dr. Stolar challenges the validity of the evidence. In so doing, he contends that there is indeed "physical evidence that can and will prove its falsehood

beyond any doubt, in a way that the entire structure of this case against Dr. Stolar will just crumble and justice will be served." He claims that all of the testimony and medical reports were taken out of context because an essential time frame was missing. It was Dr. Stolar's responsibility to present this evidence at trial, to object to the testimony of expert witnesses or otherwise challenge evidence supporting his negligence. He did not do so. This brings us to the procedural posture of the case and the basis for his argument in Part B of Issue Two.

Dr. Stolar alleges that he is entitled to a new trial for a variety of reasons. We first recount the timetable. This lawsuit was filed October 31, 2007. Attorney Rodney Baxter filed an answer on behalf of Dr. Stolar on May 2, 2008. Dr. Stolar lost his visa status on July 6, 2010. Baxter was permitted to withdraw on April 2, 2011, approximately six weeks before trial began on May 16, 2011. Dr. Stolar was unable to attend the hearing on Baxter's motion due to his immigration status.

Dr. Stolar maintains in his brief that he was unable to attend the trial because of an "unrelated immigration status situation, which culminated in the invalidation of his visa, without which Customs and Border Protection denied his entry to the USA on the eve of trial." As we have noted, the record clearly reflects that Dr. Stolar lost his immigration status on July 6, 2010, nearly a year before trial. On the day trial commenced, Dr. Stolar's immigration attorney, Jesse Herrera, appeared and explained the situation to the trial court:

> THE COURT: Are you Doctor Stolar.
>
> MR. HERRERA: Your Honor, I'm Jesse Herrera. I represent him in his immigration matter. And he is not able to cross over, Judge, and he wanted me to come down here and inform the Court. We're still trying to cross him over as we speak. I have somebody down at the bridge trying to get him across. And he has some immigration issues with his visa, and that's what I'm trying to do. That's why I came here this morning -- to inform the Court.

**THE COURT:  You're not going to participate in the trial itself?**

**MR. HERRERA:  No, Judge.  I'm just an immigration lawyer, yes.**

THE COURT:  You're just informing me that he's trying to cross over?

MR. HERRERA:  Yeah, he's trying to -- he's over there right now, Judge.  Now, I'm not sure he's going to make it over today.  We need to get a paid escort to bring him over, but we want Immigration to approve it and they haven't approved it yet.  We have been trying to do this since Friday.

THE COURT:  All right.

**MR. HERRERA:  So, with that, Judge, can I be excused?**

**THE COURT:  Yes, you may.**

MR. HERRERA:  Thank you, Your Honor.

THE COURT:  Thank you.

**MR. HERRERA:  And is there anything I can tell him, Judge, regarding what's going to take place?**

**THE COURT:  Tell him we're moving forward.**

**MR. HERRERA:  Okay.**

**THE COURT:  So hopefully, he gets here.  If he's not, then we just – there's going to be an empty chair here.**

MR. HERRERA:  I'll try to do that, sir.  [Emphasis added].

No oral or written motion for continuance was urged and Dr. Stolar never appeared for trial.

The case was tried to a jury between May 16th and May 20, 2011.  The trial court entered judgment in accordance with the verdict on June 8, 2011.  A timely motion for new trial, signed by Jesse Herrera and filed on July 7, 2011[9], was denied by written order on July 14, 2011.  Dr. Stolar apparently filed a second motion for new trial on August 23, 2011, after the court had

---

[9]  A motion for new trial shall be filed prior to or within thirty days after the judgment is signed.  TEX.R.CIV.P. 329b(a).

- 28 -

denied the first one.[10]  It does not appear in the clerk's record and is only contained as an appendix to Dr. Stolar's brief.  On this basis alone, we cannot consider it.[11]  This motion was signed by Rodney Baxter and predicated on newly discovered evidence.  It was accompanied by a six-page affidavit from Dr. Stolar.  But as he himself notes in his brief, there is no evidence in the record that the second motion was received or read by the trial judge.  Nor could it have been granted inasmuch as the trial court's plenary power had already expired.[12]  We overrule Issue Two in its entirety.

The trial court's judgment as to Dr. Marioni is reversed and a take nothing judgment rendered.  Having overruled the issues raised by Thompson and Dr. Stolar, the remainder of the judgment is affirmed.

October 8, 2014

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.
(Rivera, J., not participating)

---

[10]  One or more amended motions for new trial may be filed without leave of court **before** any preceding motion for new trial is overruled **and within thirty days after the judgment is signed**.  TEX.R.CIV.P. 329b(b).  [Emphasis added].

[11]  An appellate court may not consider matters outside the appellate record.  *Siefkas v. Siefkas,* 902 S.W.2d 72, 74 (Tex.App.--El Paso 1995, no writ).  The attachment of documents as appendices to briefs is not formal inclusion in the record on appeal and the documents cannot be considered.  *Perry v. Kroger Stores, Store No. 119*, 741 S.W.2d 533, 534 (Tex.App.--Dallas 1987, no writ).

[12]  If a motion for new trial is timely filed, the trial court has plenary power to grant a new trial until thirty days after all timely filed motions are overruled by written order or by operation of law, whichever first occurs.  TEX.R.CIV.P. 329b(e).