

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JORGE L. HERNANDEZ, | § | No. 08-20-00015-CV |
| Appellant, | § | Appeal from the |
| v. | § | County Court at Law No. 3 |
| KING AEROSPACE, | § | of El Paso County, Texas |
| Appellee. | § | (TC#2017-DCV-0334) |

## **O P I N I O N**

In this appeal, we face the question of whether a plaintiff-worker is an "employee" of a defendant-company under the exclusive-remedy-provision of the Texas Workers' Compensation Act. If so, the plaintiff-worker's personal injury claim is barred, and if not, he is entitled to a substantial jury award. Here, the trial court submitted the question to a jury, which found that Appellant Jorge L. Hernandez was *not* an employee of Appellee King Aerospace (King). Despite that jury finding, the trial court ultimately concluded that Hernandez was King's employee and entered a take nothing judgment in King's favor. We are asked to review that decision, as well as the procedural propriety of how the trial court decided the question. We conclude that the procedural question of whether the trial court erred in deciding the issue when it did was not preserved for review. But we also conclude that a genuine issue of material fact governs the

employment question, which was resolved against King. As a result, we reverse and remand for the trial court to render judgment for Hernandez in accordance with the jury's verdict.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Workplace Accident

King is a military defense contractor which operates several repair stations certified by the Federal Aviation Administration (FAA) to perform maintenance and repairs on aircraft. King contracts with the United States Army to perform those services on aircraft at Biggs Airfield on the Fort Bliss Army Base. While King directly hires many of its own permanent employees, it often needs additional skilled individuals on a temporary basis, including aircraft maintenance specialists. To meet this need, King often relies on Aircraft Technologies Group (ATG), which employs trained and experienced maintenance specialists. In their course of dealing, King would send ATG a notification stating that it needs a certain number and type of skilled workers for a specific project. In response, ATG would provide King with a "Quote/Proposal" which would include the resumes of qualified individuals from which King could select the workers it wants. Thereafter, ATG would issue a "Letter of Commitment" for each worker, outlining their start date, work schedule, training expectations, and commitment.

Hernandez is an experienced and certified sheet metal specialist, employed by ATG, who had been selected by King to work on several projects beginning in 2013. In January 2016, he started working on a project at King's facility to perform maintenance and repairs on a "Dash-7 aircraft" under King's contract with the Army. To accomplish painting the wing of an aircraft, Hernandez placed a ladder on top of a platform. The ladder became unstable and Hernandez suffered a fall resulting in serious injuries.

**B. The Lawsuit and Pretrial Proceedings**

Hernandez sued King asserting a negligence claim. King responded by alleging an affirmative defense: King was Hernandez's employer, King was a subscriber under the Texas Workers' Compensation Act, and thus Hernandez's exclusive remedy as to King is limited to pursuing workers' compensation benefits. King moved for traditional summary judgment on its affirmative defense. Following a hearing on that motion, the trial court informed the parties that it was "going to carry the motion until the time of trial" and that King could raise the issue then by filing a motion for directed verdict.

**C. The Trial**

Following the close of Hernandez's case at trial, King moved for a directed verdict on its affirmative defense, claiming that the evidence demonstrated as a matter of law that Hernandez was its employee. Initially, the trial court said that it was "going to carry the motion for directed verdict" to see what result the jury reached. The court informed King that at the time of entry of judgment, it would rule on the motion. The trial court also told King that it would need to "move for JNOV" at that time. Soon after, however, the trial court announced that it was denying the motion for directed verdict. After King presented its sole witness only on damages, King's attorney moved a second time for a directed verdict on its affirmative defense. Once again, the trial court expressly denied that motion.

The jury was asked whether it believed Hernandez was "acting as an employee of King Aerospace," and was given the following definition of the term "employee":

> "Employee" is a person in the service of another with the understanding, express or implied, that such other person has the right to control the details of the work and not merely the result to be accomplished.

> An "employee" includes a person who would otherwise be in the general employment of an original employer but is borrowed from that employer, so long

3

as the borrowing employer or his agents have the right to direct and control the details of the particular work inquired about. An employee may have more than one employer.

The jury unanimously found that Hernandez was *not* serving as King's employee at the time of the accident. It also found that King was 80% and Hernandez 20% at fault in causing the accident. Finally, the jury awarded Hernandez over a million dollars in damages, including medical expenses, physical impairment, disfigurement, lost wages, and pain and suffering.

### D. Post-Trial Proceedings

After trial, Hernandez filed a "Motion to Enter Judgment," seeking entry of a judgment in accordance with the jury's verdict. Following several re-settings of the hearing, the trial court sua sponte issued an "Order Appointing Special Master." In that order, the trial court noted that King had made a motion for directed verdict at trial, "which the Court took under advisement." The court then stated that it found "this to be an exceptional case and finds good cause for the appointment of a Special Master to assist the Court in evaluating the issue of whether the evidence admitted at trial was sufficient to allow the submission of [the employment status issue] to the jury for its determination." The court ordered the special master to review the reporter's record of the trial testimony and report on whether there was sufficient evidence to submit the employment issue to the jury. The court further noted that upon receiving the report, it would have the option to "confirm, modify, correct, reject, reverse, or recommit the report of the Special Master after it is filed, as the Court may deem necessary in the particular circumstances of this case."

Neither party objected to the Order Appointing Special Master, and both parties submitted briefs to the special master, outlining their respective positions on the issue of whether there was sufficient evidence to support the jury's finding that King was not Hernandez's employer.[1] In his

---

[1] Rule 171 grants the trial court authority "in exceptional cases" and "for good cause" to appoint a "Master in Chancery" "who shall perform all of the duties required of him by the court, and shall be under orders of the court,

final report, the master summarized the evidence admitted at trial and concluded that the record contained conflicting evidence on the issue of whether King exercised direct control or supervision over Hernandez; King thus did not conclusively prove as a matter of law that Hernandez was its employee. To the contrary, the special master concluded that the evidence was just as supportive of a finding that Hernandez was instead an "independent contractor," and consequently, the matter was properly submitted to the jury as a question of fact.

### E. The Hearing and Final Judgment

The trial court thereafter held a hearing on entry of a judgment. Hernandez argued that the special master correctly concluded that the issue of his employment status was properly submitted to the jury, while King argued that the special master was wrong because the evidence submitted at trial demonstrated, as a matter of law, that Hernandez was employed by both King and ATG. The trial court rejected the special master's ultimate conclusion and instead found in its final judgment that: "(1) Plaintiff Jorge L. Hernandez was an employee of Defendant King Aerospace; (2) Defendant King Aerospace had, at all times relevant, an active workers-compensation policy that covered Plaintiff Jorge L. Hernandez." It therefore entered a take-nothing judgment in King's favor, from which Hernandez appeals.

## II. ISSUES ON APPEAL

Hernandez raises three issues on appeal. His first issue asserts a procedural question: he contends that the trial court lacked the authority to disregard the jury's verdict without King filing a motion for judgment notwithstanding the verdict (JNOV) as required by the Rules of Civil Procedure. In Issue Two, Hernandez contends that even if the trial court could enter an order

---

and have such power as the master of chancery has in a court of equity." TEX.R.CIV.P. 171. No issue is raised in this appeal challenging either the appointment or terms of the appointment of the special master. We express no opinion on whether a special master is authorized or appropriate in this situation.

disregarding the jury's verdict, the trial court erred in doing so, as he presented at least a scintilla of evidence to support the jury's finding that he was not King's employee. Finally, in Issue Three, he contends that there was legally sufficient evidence to support the jury's verdict on the parties' comparative liability. King only addresses Hernandez's first two issues, characterizing the trial court's final judgment as a proper ruling on its motion for a directed verdict, which King believes the trial court carried until the time for entry of judgment. King also contends that the trial court correctly determined that Hernandez was its employee as a matter of law. We limit our analysis to those two issues as well, as no challenge is made to the jury's finding on negligence or damages.

## III. AUTHORITY FOR TRIAL COURT'S POST-TRIAL RULING

Hernandez argues that the trial court in effect entered a JNOV, which he contends requires a formal JNOV motion. Rule 301 of the Texas Rules of Civil Procedure provides that "[t]he judgment of the court shall conform to . . . the verdict" but that "*upon motion* and reasonable notice the court may render judgment non obstante veredicto if a directed verdict would have been proper, and provided further that the court may, upon like *motion and notice*, disregard any jury finding on a question that has no support in the evidence." TEX.R.CIV.P. 301 (emphasis added). Absent any such motion, Hernandez contends that the trial court lacked the authority to grant a JNOV on its own initiative.

In general, a litigant has a right to have "material, disputed, fact issues determined by a jury," and therefore a trial judge may not ordinarily simply disregard a jury's verdict or render a JNOV on its own initiative. *See St. Paul Fire & Marine Ins. Co. v. Bjornson*, 831 S.W.2d 366, 369 (Tex.App.--Tyler 1992, no writ); *see also Law Offices of Windle Turley, P.C. v. French*, 140 S.W.3d 407, 414 (Tex.App.--Fort Worth 2004, no pet.). Hernandez argues that under a plain reading of Rule 301, a litigant must file a written motion for a JNOV with notice to the parties

6

before a trial court can grant a JNOV. *See Lamb v. Franklin*, 976 S.W.2d 339, 343-45 (Tex.App.--Amarillo 1998, no pet.) (holding trial court erred in signing JNOV because the record did not reflect that a motion for JNOV was filed or that a hearing on such motion was had); *Olin Corp. v. Cargo Carriers, Inc.*, 673 S.W.2d 211, 213-14 (Tex.App.--Houston [14th Dist.] 1984, no writ) (concluding that trial court had no power to enter JNOV absent a proper motion to do so). Thus, Hernandez concludes that the trial court lacked the authority to ignore the jury's finding on employee-status, and he asks this Court to render a judgment based on the jury verdict.

King concedes that it did not file a JNOV motion but claims the trial court did not sua sponte grant its own JNOV. The trial court never expressly mentioned Rule 301 or used the term "JNOV" in its final judgment or at any time during the post-trial proceedings. Instead, King argues that the trial court was doing no more than making a ruling on King's motion for directed verdict that was carried from the trial. Rule 268, titled "Motion for Instructed Verdict", states only that a "motion for directed verdict shall state the specific grounds therefor." TEX.R.CIV.P. 268. Case law dictates that a motion for directed verdict must be filed before the case is submitted to the jury. *See Mitchell Resort Enters., Inc. v. C & S Builders, Inc.*, 570 S.W.2d 463, 465 (Tex.App.--Eastland 1978, writ ref'd n.r.e.); *Stephens v. Lott*, 339 S.W.2d 405, 406 (Tex.App.--San Antonio 1960, no writ). And according to King, carrying a motion for directed verdict until the time for entry of judgment has "long been an acceptable practice in Texas courts." In response to that claim, Hernandez contends that a directed verdict cannot be granted after the case has been decided by the jury, and that the trial court here unambiguously denied the motion for directed verdict at the time of trial, meaning that it could not be carried past the time the jury was discharged.

We need not resolve these opposing claims because we ultimately conclude that without an objection being lodged to the unique procedure used by the trial court, no error for that

7

procedure is properly before us. The record here shows that although the trial court first stated that it was going to "carry" King's motion for a directed verdict until after the jury returned its verdict, the trial court later twice overruled the motion for directed verdict, and once counseled King to file a JNOV motion after the jury returned its verdict if it lost. But in its order appointing the special master, the trial court said that it had carried the motion for directed verdict. And the same order expressly stated that the trial court was reserving the option to accept, reject, or modify the special master's recommendation on the employee-status question. Neither party objected to this procedure, and both submitted briefing outlining their legal positions to the special master. Nor did either party object to the trial court's statement in the order that it reserved the option to accept, reject, or modify the special master's recommendation. In sum, both parties were on notice that the trial court intended to decide the case based on the jury verdict and the review by the special master, and neither party objected that the trial court lacked the authority to do so.

Given the unique procedure employed here, we conclude that even if the rules prevent carrying a motion for directed verdict past the discharge of the jury, Hernandez cannot now complain about that procedure without some predicate objection being lodged below. *See* TEX.R.APP.P. 33.1(a)(1)(A) ("As a prerequisite to presenting a complaint for appellate review, the record must show that . . . the complaint was made to the trial court by a timely request, objection, or motion that . . . stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context").

Based on the lack of preservation, we overrule Hernandez's Issue One.

## IV. THE EVIDENCE CREATES A FACT ISSUE ON HERNANDEZ'S EMPLOYMENT STATUS

### A. The Exclusive Remedy Provision in the Workers' Compensation Act

Texas employers need not secure workers' compensation insurance, but when they do, an injured employee's exclusive remedy for an accidental work injury is limited to the workers' compensation benefits. *See* TEX.LAB.CODE ANN. § 408.001(a) ("Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage or a legal beneficiary against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee."); *Port Elevator-Brownsville v. Casados*, 358 S.W.3d 238, 241 (Tex. 2012). Because it is an affirmative defense, the employer carries the burden to prove that an injured worker was in fact an employee at the time of the accident, and that the employer's workers' compensation insurance covered the injured worker. *See Reveles v. OEP Holdings, Inc.*, 574 S.W.3d 34, 37 (Tex.App.--El Paso 2018, no pet.) ("The exclusive remedy provision is an affirmative defense that protects employers from certain common-law claims of their employees including negligence claims."). King carried a valid workers' compensation insurance policy at the time of the accident; the only question is whether Hernandez was King's employee.

Who then are employees? The Act defines an "employee" as a "person in the service of another under a contract of hire, whether express or implied, or oral or written." TEX.LAB.CODE ANN. § 401.012 (a). As well, the Act provides that an employer means "unless otherwise specified, a person who makes a contract of hire, employs one or more employees, and has workers' compensation insurance coverage." *Id*. § 401.011(18). Adding meat to the bones of the statutory language, courts have often looked to the "traditional indicia" of employment, the most important of which is the right to control the details of the work being performed. *Garza v.*

9

*Exel Logistics, Inc.*, 161 S.W.3d 473, 477 (Tex. 2005) ("Accordingly, in determining if a general employee of a temporary employment agency is also an employee of a client company for purposes of the Act, we consider traditional indicia, such as the exercise of actual control over the details of the work that gave rise to the injury."); *Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002) (per curiam) ("The test to determine whether a worker is an employee rather than an independent contractor is whether the employer has the right to control the progress, details, and methods of operations of the work."); *Painter v. Sandridge Energy, Inc.*, 511 S.W.3d 713, 723-24 (Tex.App.--El Paso 2015, pet. denied) ("The attributes of an employer include the right to hire and fire, the obligation to pay wages and withhold taxes, the furnishing of tools, and most of all the power to control the details of the worker's performance.").

The Texas Supreme Court's most recent writing on the issue adds guidance. In *Waste Mgmt. of Texas, Inc. v. Stevenson*, the court faced an injury to the employee of a staff leasing company. 622 S.W.3d 273, 276 (Tex. 2021). The leased employee, Stevenson, brought a negligence claim against the client company, Waste Management. And as here, Waste Management was a subscriber under the Texas Workers' Compensation Act and asserted that Stevenson's claim was barred by the exclusive-remedy defense because Stevenson was its employee. In Texas, an employee may have more than one employer at the time of an injury for the purposes of the exclusive-remedy defense under the Act. *See Wingfoot Enterprises v. Alvarado*, 111 S.W.3d 134, 140 (Tex. 2003) (the "Act permits more than one employer for workers' compensation purposes"); *see also W. Steel Co. v. Altenburg*, 206 S.W.3d 121, 123 (Tex. 2006) (per curiam) ("An employee may have more than one employer within the meaning of the TWCA and each employer may raise the exclusive remedy provision as a bar to the employee's claims.").

10

Thus, Stevenson could be both the employee of Waste Management and the employee leasing agency.

According to the court, the evidence in that case was undisputed that in actual practice, Waste Management controlled the "progress, details, and methods of operations of the work." *Waste Mgmt.*, 622 S.W.3d at 280, *quoting Limestone Prods.*, 71 S.W.3d at 312. Stevenson himself agreed his Waste Management supervisor had "the ability to tell you what to do and how to do your job" and the truck driver to which Stevenson was assigned was the "captain of the ship." *Id.* at 279. The Waste Management truck driver agreed he controlled Stevenson "with respect to how to do the job." *Id.* The Waste Management operations manager also agreed the driver was in "full control" of workers like Stevenson. *Id.* Lastly, the owner of the staff leasing company concurred that it did not manage temporary employees, but Waste Management would. *Id.* at 280.

The wrinkle in the case was the contract documents designated Stevenson as an independent contractor, which conflicted with Waste Management's claim that Stevenson was its employee. *See Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 132 (Tex. 2018) (stating test for what distinguishes an employee from an independent contractor); *Waste Mgmt.*, 622 S.W.3d at 287 n.1 (Boyd, J., concurring) (collecting cases similarly distinguishing independent contractors from employees or borrowed servants). And generally, a contract that designates one as an independent contractor should be given effect unless it was a subterfuge, is later modified, or the parties' conduct supports an inference that they impliedly consented to a different arrangement. *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 590 (Tex. 1964). From this principle, Stevenson argued that at least a fact question was raised as to his status, as the appeal arose from a granted summary judgment.

11

The Texas Supreme Court, however, concluded that the actual "on-the-ground realities" were so inconsistent with the contract that there was no genuine issue of material fact on the right to control question. *Waste Mgmt.*, 622 S.W.3d at 284. The court looked to one of its earlier cases, *Exxon Corp. v. Perez*, that held: "A contract between two employers providing that one shall have the right of control . . . is a factor to be considered, but it is not controlling." 842 S.W.2d 629, 630 (Tex. 1992) (per curiam). Thus, "a contract between two companies purporting to dictate the nature of a worker's employment relationship with the companies is merely 'a factor to be considered' if the right of control is 'a controverted issue.'" *Waste Mgmt.*, 622 S.W.3d at 283, *quoting Perez*, 842 S.W.2d at 630.

### B. Standard of Review

A party is entitled to a directed verdict if no evidence of probative force raises a fact issue on the material questions in the suit, or the evidence establishes a claim or defense as a matter of law. *Prudential Ins. Co. of Am. v. Financial Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Thompson v. Stolar*, 458 S.W.3d 46, 63 (Tex.App.--El Paso 2014, no pet.). Here we deal with an affirmative defense that King carried the burden to prove. Thus, it carried the burden to establish the defense as a matter of law. *See Richard Rosen, Inc. v. Mendivil*, 225 S.W.3d 181, 192 (Tex.App.--El Paso 2005, pet. denied), *citing Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). On the other hand, Hernandez's claim that the trial court erred in granting a directed verdict (or as it claims, a JNOV) should be sustained if we determine that any conflicting evidence of probative value raises a material fact issue contrary to King's defensive theory. *See Szczepanik v. First Southern Tr. Co.*, 883 S.W.2d 648, 649 (Tex. 1994) (per curiam) ("In reviewing the granting of an instructed verdict, we must determine whether there is any evidence of probative

12

force to raise a fact issue on the material questions presented.").[2] In performing that review, we must credit evidence favorable to the non-movant if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Stolar*, 458 S.W.3d at 63. The ultimate test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827.

### C. Overview of the Right to Control Testimony

With this backdrop, we tackle the question of whether the trial court correctly granted a directed verdict on the question of whether Hernandez was an employee of King for the exclusive remedy bar under the Texas Workers' Compensation Act. The relevant trial testimony came from Hernandez, Tommy Quijas (ATG's on site supervisor), Michael Beck (an ATG co-worker), Gerald Torres (King's on-site supervisor); and several workplace documents admitted through the witnesses.

Hernandez testified that ATG operated as a headhunter; he would submit his resume to ATG who then would place him with a company that needed the type of work he could provide. King was the only ATG customer he worked at while working with ATG. For the King jobs, he reported to work at a hanger maintained by King at Fort Bliss. A King representative was always present for security reasons, and they were restricted to the area for the airplane that they were working on. ATG, however, issued his pay checks, withheld taxes and Social Security, and sent him a W-2. He wore an ATG issued t-shirt on the job.

---

[2] Even were we to consider the trial court's ruling as the grant of a JNOV as Hernandez suggests in his first issue, the standard of review would be no different: a JNOV is proper when a directed verdict would have been proper. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) ("[T]he test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review.").

As with all ATG people, Hernandez was already trained and qualified to do his job. Hernandez held an FAA "A" license, or airframe license. In performing his duties, he had no choice other than to follow the FAA-approved OEM manuals. The manuals were created by the equipment manufacturers and made available in a library maintained by King, or through a computer terminal at King's facility. If the manuals did not dictate the repair procedure for a particular issue on an airplane, he would obtain that procedure from the manufacturer directly, and it would have to be approved by an ATG inspector. According to Hernandez, the ATG inspector signed off on the work he performed, King did not.

Hernandez testified that no one from King controlled the details of how he performed his work. He already knew how to look up a repair in the manual and follow those instructions. No one from King ever told him how much time he could spend on a specific job. On the job site, Mr. Tommy Quijas, an ATG employee, was his maintenance supervisor and the ATG site manager. He took his orders from Quijas, who set the work pace and told him what he was to do each day. Hernandez conceded, however, that Gerald Torres would tell Quijas what he wanted done in a particular day, and Quijas was there to make it happen. As with other aircraft mechanics, Hernandez personally bought his own tools and toolbox. King, however, provided specialized equipment such as stands, ladders, paint, masking tape, and torque wrenches.

Hernandez did not consider himself an employee of King. ATG could reassign him to another customer without King Aerospace's permission, and while King could remove him from the premises, it could not terminate his employment with ATG. He received an ATG handbook and claims that he never saw King's operations handbook or employee handbook. King did provide "Blue Tuna" training, described as an aviation-based OSHA program, as well as instruction on

14

more typical work-place issues.[3] Hernandez also acknowledged that all ATG employees were supposed to follow King Aerospace's safety rules.

Tommy Quijas also testified at trial. He is employed by ATG and describes himself as Hernandez's site lead. He was in charge of ATG personnel and tasked with making sure the jobs that King assigned were performed. He was also responsible to ensure that the work progressed according to schedule. He reported to Gerald Torres, King's site manager. Torres would mostly take care of King Aerospace responsibilities and would come to the work site to check on the workers' progress and address supply issues. Torres told Quijas what needed to be done, and Quijas would in turn instruct the ATG employees on what to do. Torres identified weekly progress goals and Quijas would separate those into daily tasks. Torres never controlled or told ATG employees how to do the details of their work. At the time of his injury, Hernandez was performing a "prep" task which he knew how to do. In doing the work, Hernandez had to follow FAA regulations, which ATG employees were generally familiar with. King did not provide training on FAA regulations, but it did make available the maintenance manuals that ATG employees used.

The jury also heard from Gerald Torres who identified himself as King's fleet logistics and fleet maintenance manager. He supervised several plants, including the El Paso site. ATG is considered a contractor and when asked whether the ATG crew members were contractors, he answered, "That's kind of a hard situation because everybody, including myself, are considered contractors."

---

[3] Those topic areas included: sexual harassment, HAZMAT, facility orientation, safety egress, work areas, hours, breaks, mealtimes, injury prevention, office equipment, time cards, parking, hangar emergency action training, site security, overhead hoist operations, fall protection, manual location, how to fill out forms and time cards and training records, alcohol in the workplace, drug abuse, personal protective equipment, hazard communication, toolbox inventory, ladder and stand safety use and inspection, hangar door operation, flight line fire extinguisher and aircraft marshaling, respiratory protection, eye protection, supply room location, lifting equipment, back safety and lifting technique.

Torres also agreed that ATG workers were experienced, but King was responsible to ensure that ATG individuals performed only the duties they were qualified and authorized to perform. King decided the type of mechanic or personnel needed for a project and then selected the individuals for each position from the resumes provided by ATG. For security reasons, King approved workers assigned through ATG.

Torres testified that there is a "memorandum of agreement" between ATG and King, but that King could not find a copy of it. King also has direct employees on site which it treats no differently than ATG employees. King provided a time clock for both its own employees and subcontractor employees. Further, Torres had to approve the timecards which he would then send to ATG in bulk. King set the work schedule and approved any overtime. Torres could remove ATG workers from the project but could not terminate their employment with ATG. But neither could Quijas (or anybody else from ATG) fire an ATG person from the project. Torres considered himself the "big-picture guy" who told Quijas what he wanted accomplished on a day-by-day basis. He and Quijas attended daily meetings and he would instruct Quijas before the meeting on what he wanted done that day or that week. Quijas would then assign work tasks. Torres agreed that the FAA controls the details on how the work must be performed and he could not tell Hernandez to do something contrary to the manual. But the FAA relies on King to ensure that workers follow the procedures and rules in the manuals.

Contrary to Hernandez's testimony, Torres believed that no one from ATG signed off on the work that was done for King. He personally performed the final runs and signed off on the operational or functional checks and the whole inspection. In doing so, he certified that the FAA-approved manuals had been followed to do the details of the work.

16

King owns the manlifts, ladders, platforms, and scaffolding used at the hangar. It also provided the masking tape, paint guns, and paint. It provided drill bits, safety glasses, wash stations, and respirators. Specifically, King owned the stands used when Hernandez fell. What's more, King provided a safety program which included a ladder safety training program. Hernandez could not perform his job without using a ladder and stand.[4]

King completed an OSHA 301 injury report which identified Hernandez as the injured "employee." But another internal King memorandum that reports Hernandez's injury calls him an "ATG sub-contractor employee."

**D. Right to Control by Contract**

We first address the right to control based on contract. King argues that its contract with ATG expressly set forth King's right to control Hernandez's work, and that this contract established, as a matter of law, that Hernandez was its borrowed employee.

The document that King relies on is labeled as "King Aerospace (KA) in El Paso-ATG Letter of Commitment." It contains several headings, such as "Assignment Details" that includes a start date, the identity of the ATG site representative, and the King project manager. Under the heading "As an employee of Aircraft Technologies Group," King focuses on this language:

> Purpose: To perform support work as required by client. Work to be carried out in accordance with and under the direction of King Aerospace Management.

That same section contains several work rules, such as restrictions on cell phones and a requirement that each worker's tools be etched with identifying information. Other parts of the document require a six-day work week, a daily shift meeting to be conducted by the King "Lead"

---

[4] Michael Beck, one of Hernandez's ATG co-workers, testified that he was told he would receive, but did not, safety training on lifts, stands, and ladders—which is the norm "for everywhere you go to work in aviation." Beck also described his role as a "contractor," which he explained is common in aviation.

and a "QA Inspector," adherence to a dress code (that required either a King or ATG t-shirt), and that workers "follow the required [King] and Army Policy and Procedures."

King contends that this contractual language establishes a right of control as a matter of law. We disagree.

### 1. Is the contract dispositive of the right to control?

In *Waste Management*, the court concluded that a contract that designated the worker as an independent contractor did not dictate the outcome of the control question when the facts on the ground established otherwise; the testimony conclusively showed that Waste Management controlled the details of the progress, details, and methods of operations of the work performed. 622 S.W.3d at 282-83. The court cited its earlier opinion in *Exxon Corporation v. Perez* where a contract governing the worker's status was treated "as a factor to be considered, but it is not controlling." 842 S.W.2d at 630. In particular, a contract is not dispositive in determining a worker's employment status when there is evidence outside the contract "to show that despite the contract terms, the true operating agreement vested the right of control in the principal." *Weidner v. Sanchez*, 14 S.W.3d 353, 374 (Tex.App.--Houston [14th Dist.] 2000, no pet.). When the parties' "contract says one thing, but the parties continually act in disregard of the contractual delineation of right of control, we are directed to simply consider the control provisions as one factor to weigh against any conflicting evidence of the exercise of that right to determine whether there is sufficient evidence to present the right of control issue to the fact finder." *Alice Leasing Corp. v. Castillo*, 53 S.W.3d 433, 440-41 (Tex.App.--San Antonio 2001, pet. denied).

The contract in *Waste Management* and *Perez* both provided that someone *other* than the defendant-company controlled the worker's action while the conduct of the parties in the workplace showed otherwise. In those situations, the court found that the contract did not dictate

18

the outcome of the right to control test because the right of control traditionally can be established *either* through the parties' express contractual arrangement, or if none, by an implied contract proven through their actual conduct. *See, e.g.*, *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002). We allow for the prospect, however, that the converse may not necessarily be true. Where a contract expressly allocates control to a defendant-company that chooses not to exercise that control in practice, it does not necessarily follow that the defendant-company has lost its contractual right of control. As courts often note, it is the "right to control" that governs, and not whether that contractual right is actually exercised. *Love*, 380 S.W.2d at 585 ("[O]n the question of control, the test is not the exercise thereof, but the right to exercise such control."), *quoting King v. Galloway*, 284 S.W. 942, 944 (Tex. Comm'n App. 1926). If a written contract creates a right to control, then the plaintiff need not prove an actual exercise of that control to establish a duty. *Bright*, 89 S.W.3d at 606; *Elliott-Williams Co. v. Diaz*, 9 S.W.3d 801, 804 (Tex. 1999).

Thus, at the risk of overreading *Waste Management*, we do not discount that King might find a right of control in its contractual documents. The problem here, however, is that the documents offered raised their own fact questions.

### 2. King failed to produce its actual contract with Hernandez

The "King Aerospace (KA) in El Paso-ATG Letter of Commitment" on which King bases its argument does not bear Hernandez's signature, nor does it refer to Hernandez's employment. At trial, Hernandez was shown a copy of the contract and testified that although he did recall signing a letter of commitment, the letter he was shown was *not his* letter of commitment.[5]

---

[5] When pressed on the question in cross-examination, Hernandez testified as follows:

Q. Okay. Are you testifying, sir, that the contract that we haven't seen says that you're not to do work in accordance with and under the direction of King Aerospace?

A. I'm saying that I don't know what my contract says. This is not my contract.

Q. But you think you might have had something different than the standard one?

19

Moreover, King's exhibit referenced a different project than the one to which Hernandez was assigned and had a different start date on it. Hernandez also testified that he could not recall the exact terms of his contract, and he could not verify that his letter of commitment contained the same terms as the one King introduced at trial.

King, though, contends its fleet manager, Gerald Torres, testified that its exhibit was the "standard form" contract signed by all "ATG contractors." From that testimony, King concludes that no reasonable juror could have believed that Hernandez did not sign the same form contract at the start of his assignment. In support of this argument, King relies on our sister court's holding in *Mosqueda v. G & H Diversified Mfg., Inc.*, 223 S.W.3d 571, 574 (Tex.App.--Houston [14th Dist.] 2007, pet. denied). In that case, a client company produced evidence of daily "time tickets" that it signed when the plaintiff—a temporary worker who had been placed to work at its facility—completed her daily work assignments. *Id.* at 574-575. The time tickets contained pre-printed "conditions of service" that the client company relied on for its exclusive remedies defense. *Id.* at 574-75, 577. The court held that although the defendant did not produce any time tickets from the day that the plaintiff was injured, the time tickets that were introduced contained language establishing a right to control. *Id.* at 577.

Unlike the facts in *Mosqueda*, however, King did not produce a form document that was uniformly replicated each time it was used. Hernandez's testimony supports the inference that whatever his actual agreement stated, it was on a different form, because the form he recalled specified the type of aircraft he was to work on. The exemplar form that King relies on contains no similar term. As a result, the discrepancy in the contract created a factual dispute on what contract terms governed the parties' relationship. *See generally In re Bunzle USA, Inc.*, 155 S.W.

---

A. I'm saying this is not my contract.

20

3d 202, 209-210 (Tex.App.--El Paso 2004, orig. proceeding) (the question of whether the parties intended to be bound by an unsigned contract, or a contract that only one party signed, is generally a question for the fact finder to resolve).

### 3. King's standard contract did not definitively establish its right to control

Even at that, the standard form contract that King introduced at trial does not establish that King was Hernandez's employer as a matter of law. The contract repeatedly referred to the temporary worker as ATG's employee, as an ATG technician, as ATG staff, and as ATG personnel. King focuses on language that the worker was to "perform support work as required by [King]" and was "to be carried out in accordance with and under [King's] direction." And the worker agreed to "follow" the policy and procedures required by King and the Department of the Army (with whom King was contracted). While the language used in the contract could have been considered by the jury as a factor in determining Hernandez's employment status, the language does not conclusively establish that King was Hernandez's employer for purposes of the Workers' Compensation Act. In particular, the language did not say that King had the right to directly supervise and direct the aircraft mechanics in how to perform the methods and means by which they performed aviation repairs and maintenance. And the record showed that those methods and means are dictated by neither King nor ATG, but through Army regulations that mandate the use of OEM manuals for repairing military aircraft. When those manuals did not describe a work procedure, a skilled worker such as Hernandez would consult the manufacturer of the aircraft. As a certified repair facility, King was contractually obligated to follow these procedures. And Hernandez as a licensed aircraft worker had to follow these procedures. The language in the standard form contract that a worker was to carry out their work "in accordance with and under

21

[King's] direction" said no more than what the worker was already obligated to do under federal law.

In addition, while the contract required the ATG mechanics to receive safety training from King's management before starting work, it did not require them to undergo any training on how to perform their actual jobs in that they admittedly came to the project fully trained and experienced in performing aviation repairs and maintenance. Finally, although the contract established basic workplace procedures and policies that the ATG mechanics were to follow at King's facility— such as how to obtain access to the base, where to park, cell phone usage—the contract did not set forth the procedures to be followed by the mechanics in performing their work.

So even if we were to find that Hernandez signed King's standard contract, we find there is some evidence undermining the import of the document as conclusively establishing that Hernandez was King's employee. We therefore turn next to the question of whether King exercised actual control over the details of Hernandez's day-to-day work. *See Allstate Ins. Co. v. Scott*, 511 S.W.2d 412, 414 (Tex.App.--El Paso 1974, writ ref'd n.r.e.) (where there is no express employment contract, or where the terms of the contract were "indefinite," the exercise of actual control is the best evidence available in determining the right of control).

**D. Did King Exercise Actual Control Over the Details of Hernandez's Work?**

At the heart of this case is Hernandez's status: Was he an employee of both ATG and King, or was there was sufficient evidence for the jury to decide that Hernandez was only a contractor as to King? By definition, an independent contractor does not submit to anyone's control when performing the details of their work. *See Fred Loya Ins. Agency, Inc. v. Cohen*, 446 S.W.3d 913, 924 (Tex.App.--El Paso 2014, pet. denied) (an independent contractor is one who, in pursuit of an independent business, undertakes specific work for another using his or her own means and

22

methods without submitting to the control of the other person as to the details of the work); *see also Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 131 (Tex. 2018) (in determining whether a worker was an employee or an independent contractor, court must examine "whether the employer has the right to control the progress, details, and methods of operations of the work"), *citing Limestone Prods.*, 71 S.W.3d at 312 (worker who delivered limestone for defendant was independent contractor, where defendant merely controlled the end sought to be accomplished—determining where and when to deliver the load—while the worker controlled the means and details of accomplishing the work such as the route to take to deliver the load).

Of course, if Hernandez was a true independent contractor, King would also not be liable for the injury. *See Painter*, 511 S.W.3d at 723. But Hernandez's theory is that he was a contractor who was controlled enough by King to make it liable for the injury, but not so much as to confer employer status. *See* Restatement (Second) of Torts § 414 (1977) ("One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."); *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985) ("This rule applies when the employer retains some control over the manner in which the independent contractor's work is performed, but does not retain the degree of control which would subject him to liability as a master.").

What then makes the control so complete as to qualify the worker as an employee (or "borrowed servant"), and not merely a contractor? "[I]n determining if a general employee of a temporary employment agency is also an employee of a client company for purposes of the Act, we consider traditional indicia, such as the exercise of actual control over the details of the work that gave rise to the injury." *Garza*, 161 S.W.3d at 477. Those traditional indicia also consider

23

several factors: (1) the independent nature of the worker's business; (2) the worker's obligation to furnish necessary tools, supplies, and materials to perform the job; (3) the worker's right to control the progress of the work except about final results; (4) the time for which the worker is employed; and (5) the method of payment, whether by unit of time or by the job. *Limestone Prods.*, 71 S.W.3d at 312 (setting out factors to distinguish an employee from an independent contractor).

Hernandez testified at trial that he was not controlled by either ATG or King, and that he was instead a "contractor" who worked independently of either entity, relying solely on certain FAA requirements and manuals in performing his job. That testimony constitutes some evidence negating an employer-employee relationship based on control. Under our standard of review, we must credit evidence favorable to Hernandez if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *See City of Keller*, 168 S.W.3d at 827. Given that standard, we address in turn King's arguments for why the evidence it introduced below purportedly prove Hernandez's employee status as a matter of law.

### *1. The FAA regulations*

To demonstrate its control over the details of Hernandez's work, King relies heavily on the FAA regulations governing certified repair stations. It argues that the regulations required King to direct and control the work done by Hernandez and the other mechanics working at its facility. We conclude, however, that while the regulations require a certified repair station to exercise general oversight of the work done at the facility, they do not require a repair station to exercise the type of day-to-day direct supervision of its aviation mechanics that would render them employees of the station as a matter of law for purposes of the Workers' Compensation Act.

The FAA regulations focus on two general goals: to ensure that only qualified individuals are allowed to perform aviation repairs and maintenance, and to ensure that an aircraft is ready to

24

be returned to service after all necessary repairs and maintenance have been completed. To that end, the regulations require a repair station to designate an "accountable manager"—here Gerald Torres—who is tasked with ensuring that the station is staffed with "qualified personnel to plan, supervise, perform, and approve for return to service the maintenance, preventive maintenance, or alterations performed under the repair station certificate and operations specifications." 14 C.F.R. § 145.151(b) (2022). This requirement includes ensuring that the station has sufficient employees with the "training or knowledge and experience" in aviation maintenance to ensure that "all work is performed in accordance with part 43 [of the FAA regulations]," and that only qualified and licensed personnel perform repairs and maintenance. *Id*. § 145.151(c). As well, the regulations state that the accountable manager is "responsible for and has the authority over all repair station operations that are conducted under part 145 [of the FAA regulations], including ensuring that repair station personnel follow the regulations and serving as the primary contact with the FAA." *Id*. § 145.3(a).

But as Torres himself testified, his role as the accountable manager was a "big picture" job. In that role, he oversaw the work done at five of King's facilities, including the El Paso location, as well as facilities in Korea, Iraq, Colombia, and Nevada. Torres did not testify that his role as accountable manager included any direct supervision over the mechanics in performing their repair and maintenance work at any of the facilities, nor do the regulations appear to impose that requirement on him or any other King employee. To the contrary, while the regulations provide that a certified repair station must have enough supervisors to "direct the work performed under the repair station certificate and operations specifications," it only requires supervisors to "oversee the work performed by any individuals who are *unfamiliar* with the methods, techniques, practices, aids, equipment, and tools used to perform the maintenance, preventive maintenance, or

25

alterations)." *Id*. § 145.153(a) (emphasis added). Here, the undisputed evidence established that Hernandez and the other ATG employees came to the facility fully trained on how to perform aviation repairs and maintenance. As well, the regulations specify that a "person directly in charge" of the work performed at a certified repair station does *not* need to physically observe and direct each worker constantly but "must be available for consultation on matters requiring instruction or decision from higher authority." *Id*. § 145.3(c) (emphasis added). Moreover, the regulations expressly allow a certified repair station to contract a maintenance function to an "outside source" upon approval by the FAA, and they also allow a repair station to "[a]rrange for another person to perform the maintenance, preventive maintenance, or alterations of any article for which the certificated repair station is rated." *Id*. § 145.217 (authorizing a repair station to contract repair and maintenance work to an outside source); *Id*. § 145.201 (a certified repair station may perform the maintenance itself or arrange for another person to do so). And these provisions do not appear to require the certified repair station to direct or control the day-to-day activities or work performed by the contracted source. Rather, they would allow repair stations to hire independent contractors who may work with limited supervision in the manner that Hernandez suggested he did at King's facility.

The regulations do require a certified repair station to inspect an aircraft after all necessary repairs and maintenance. They also require the certified repair station to certify that all work performed was done in accordance with FAA regulations. However, they do not go quite so far as to require the repair station to conduct any inspections of a mechanic's work until the completion of a project. *See Id*. § 145.213(a) ("A certificated repair station must inspect each article upon which it has performed maintenance, preventive maintenance, or alterations as described in paragraphs (b) and (c) of this section before approving that article for return to service."); *Id*.

§ 145.201(c)(1) (a certified repair station may only approve an aircraft for return to service when any maintenance, preventive maintenance, or alteration was performed in accordance with the applicable approved technical data or data acceptable to the FAA). That requirement would be equally consistent with hiring an independent contractor and inspecting their final work product to ensure it meets the contract requirements. In short, we find nothing in the federal regulations that required King, its accountable manager, or its supervisors to direct or control the day-to-day work performed by Hernandez. Nor do we find anything that would otherwise mandate a finding that Hernandez was King's employee as a matter of law for purposes of the Workers' Compensation Act.

### 2. *The chain of command at the King facility*

King also argues that it has implemented a "chain of command" that places "King management personnel at the top directing all work to be done at King's facility." The evidence at trial, however, also established that the ATG employees had their own internal chain of command at the facility. The evidence for which supervisor in these two chains controlled the day-to-day work was at best conflicting.

King designated an ATG employee, here Tommy Quijas, to act in a supervisory lead role to communicate and assign King's direction to other ATG workers. In turn, Hernandez was designated as the lead sheet metal mechanic to supervise the other sheet metal mechanics employed by ATG. At the time of his accident, he had at least one ATG mechanic, Michael Beck, under his supervision. Torres would meet with Quijas each morning to advise him of the work that needed to be done by the ATG employees that day to keep the project on an acceptable timeline. The ATG employees would not be permitted to deviate from his set timeline, but Torres acknowledged that Quijas would "assign" the ATG employees their "work tasks" for the day. Moreover, although

27

Torres testified that Quijas did not technically "supervise" the ATG employees, he acknowledged that besides assigning daily work tasks to the ATG employees, Quijas addressed issues with them when they arose. In addition, Quijas testified, without contradiction, that there were occasions on which he informed Torres that the ATG crew could not perform certain tasks within the timeframe that he had requested. As Torres himself acknowledged, he and Quijas would decide in consultation with each other if the ATG employees needed to work overtime to meet King's timeframe to finish a project.

Hernandez also testified that Quijas gave him his "orders" day-to-day, and that neither Torres nor any other King employee provided him or the other ATG employees with any instructions or guidance in performing their work. Torres did not contradict Hernandez's testimony, and the record contains no evidence that Torres: (1) directly supervised or corrected the ATG employees' work; (2) conducted daily or even weekly inspections of the ATG employees' work; or (3) required them to report their progress to him at any time during the project. To the contrary, as explained above, Torres viewed himself as the "big picture guy," who had to keep the project on track and signed off on final inspections, but who did not communicate directly with anyone other than the ATG lead supervisor.

Thus, while the management structure at the facility established that King controlled the "end sought to be accomplished,"—the timely and satisfactory completion of the project on which Hernandez was working—the evidence was conflicting on whether King controlled the details, the methods or the means by which Hernandez accomplished that end goal. And again, a "borrowing employer must control not merely the end sought to be accomplished, but also the means and details of its accomplishment." *Flores v. N. American Tech. Grp., Inc.*, 176 S.W.3d 442, 449 (Tex.App.--Houston [1st Dist.] 2004, pet. denied). Therefore, the fact that King had the right to

28

control the general timeline and the end goal of the project did not conclusively establish that Hernandez was King's employee.

### 3. Control over safety issues v. control over the actual work

Finally, King contends that: (1) even if it did not control the technical aspects of Hernandez's work in performing aviation repairs and maintenance, it did control the use of safety equipment at its facility; and that (2) the undisputed evidence established that it had furnished Hernandez with the ladder and platform that Hernandez was using at the time of his accident. King also points out that the undisputed evidence established that King had trained Hernandez not to place a ladder on top of the platform when he first started working at the facility, and that Hernandez acknowledged he had acted in violation of that training by placing the ladder on top of the platform, which in turn was the cause of his accident. King contends these facts place it in charge of the "details of the work that gave rise to his injury," *Garza*, 161 S.W.3d at 477, and thus his employer for purposes of the Workers' Compensation.

We could agree with King that it had the right to control safety issues at the facility. Although Hernandez and the other ATG employees came to the facility as licensed and skilled aviation mechanics, King provided safety training to all its newly hired employees, whether King hired them directly or through ATG.[6] In particular, the evidence established that King provided Hernandez with such safety training, which included ladder safety and fall protection training as a condition of his employment. King also furnished the ladders and other safety equipment that Hernandez and the other ATG employees used in performing their work.

---

[6] This training was based on another manual, known as the "Flight and Ground Operation Procedures" Manual (also called the "OPS Manual"), which was approved by the Department of the Army to be used by King as part of its contractual obligation to perform maintenance and repairs of the Army's aircraft. The OPS Manual addressed safety, loss prevention, and staffing issues, but provided no guidance on how to perform repairs or maintenance on aircraft.

The record thus presents this situation: King controlled Hernandez's use of the ladder and platform to reach the airplane wing, but not the work that Hernandez was doing on the wing. Does this level of control on this one issue render Hernandez an employee (or borrowed servant) of King as a matter of law, or is merely the element of control that makes it liable for injury to an on-site contractor? And more to the point, King did not direct Hernandez to use the ladder and platform as he did, but instead King would have prevented that use if it had enforced the rules it claims to have had in place.

King heavily relies on the Texas Supreme Court's decision in *Garza v. Exel Logistics, Inc*, which held for determining whether a worker from a temporary staffing agency was the client company's borrowed employee, the key question is whether the client company exercised "actual control over the details of the work that gave rise to the injury." *See, e.g.*, *Garza*, 161 S.W.3d at 477. In turn, King contends that the particular "detail" that gave rise to Hernandez's injury was the misuse of King's safety equipment. We do not, however, read *Garza* so broadly.

In *Garza*, the court determined that the plaintiff, who was an employee of a temporary staffing agency, was also the client company's employee for purposes of the Workers' Compensation Act. The undisputed evidence established that the plaintiff was performing a task under the direct supervision of the client company's employee at the time of his injury. *Id*. at 477. In particular, the plaintiff was injured when he responded to "direct instructions" from the client company's supervisor to cross over a moving conveyor belt to turn off a machine, which in turn caused his injury. *Id*. Thus, the court held that the "details of [the plaintiff's] work that caused [his] injury were specifically directed by" the client company. *Id*.

In contrast, Hernandez was not injured due to any instructions that King gave him. Rather, the opposite is true, as King had trained Hernandez *not* to place a ladder on top of a platform, and

his injury was caused by his violation of that training.[7] In addition, while King had the right to control the use of the ladders and other safety equipment, there was conflicting evidence on whether they actually exercised that right. As Hernandez testified at trial, despite being trained otherwise, it was "common practice" at the facility to place ladders on top of platforms to reach the upper part of an aircraft on which the mechanics were working, and Torres was aware of the practice, but did not correct it. And in fact, Hernandez testified that he and other ATG employees complained to King management that the platforms were unsafe, but management provided no alternative to them. Accordingly, despite King's ownership of the ladders and their training on how to use the ladders, the evidence established that King was allowing Hernandez and the others to use the ladders in the manner they saw fit in performing their work and were thus not in fact exercising any actual control over their use at the time of Hernandez's accident.

Finally, King relies on our sister court's holding in *Flores*, in which the court found that an employee of a temporary staffing agency was serving as a borrowed employee of a client company for purposes of the Workers' Compensation Act, where he was injured while operating a piece of equipment at the client company's facility. *Flores*, 176 S.W. 3d. at 450. In that case, the undisputed evidence established that at the time of the injury, the plaintiff came to the client company's plant as a general laborer with "general safety training" but without any training on the machines used in the plant. *Id*. The client company provided hands-on training for each piece of machinery to which he was assigned, including the molding machine where the injury occurred. *Id*. Nor did the temporary staffing company have any supervisory employees on-site. *Id*. The client company supervised and monitored the temporary employees' "day-to-day activities." *Id*. In

---

[7] Had the jury fully believed that evidence, it could have either failed to find King negligent, or placed a sufficient degree of fault on Hernandez to bar his recovery. The jury findings on fault and apportionment of fault have not been challenged.

contrast, Hernandez presented evidence that he received his work assignments and orders from his ATG lead supervisor, he was a uniquely skilled employee who needed no training, and that if anyone supervised him, it was the ATG lead.

We therefore conclude that the record contains some conflicting evidence of probative force over whether Hernandez was an employee of King at the time of the accident. Even considering the contrary evidence that King advances, it did not conclusively establish that it was Hernandez's employer at the time of his accident for purposes of the exclusive remedies provision in the Workers' Compensation Act. As a result, we agree with Hernandez that the trial court erred in disregarding the jury's verdict.

Hernandez's Issue Two is sustained.

## V. CONCLUSION

The trial court's judgment is reversed, and we remand this matter to the trial court with directions to reinstate the jury's verdict, and to render a judgment on that verdict.

JEFF ALLEY, Justice

September 28, 2022

Before Rodriguez, C.J., Palafox, and Alley, JJ.

32